[No. B220739. Second Dist., Div. Six. Mar. 25, 2010.]

In re KARL LORESCH on Habeas Corpus.

**COUNSEL**

Rich Pfeiffer, under appointment by the Court of Appeal, for Petitioner Karl Loresch.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Julie L. Garland and Jennifer L. Heinisch, Deputy Attorneys General, for Respondent State of California.

**OPINION**

**YEGAN, Acting P. J.**—In this petition for writ of habeas corpus, Karl Loresch seeks to vacate the Governor's order reversing the 2008 decision by the Board of Parole Hearings (the Board) to grant him parole. The petition is meritorious. The record is devoid of "some evidence" supporting the Governor's conclusion that petitioner is unsuitable for parole because he is currently dangerous. As we shall explain, the Governor's order rests solely on speculation that in the future petitioner could relapse and commit acts of violence. We do not doubt the Governor's sincerity, but his decision must be based on some evidence of current dangerousness, not speculation as to future dangerousness.

*The Commitment Offense*

In June 1982 petitioner pleaded guilty to the first degree murder of Judy Martino. He was sentenced to prison for 25 years to life. Petitioner committed the offense in April 1982, when he was 22 years old and a sergeant in the Army.

Petitioner was friendly with Herman Rose, who was involved in "a vehicle theft ring." Petitioner told the Board that he was not involved in the ring, but he "knew what they were doing." In 2008 petitioner told a forensic psychologist, Dr. Steven Barron, that he "was involved with [Rose] and the group [Rose] was with."

Rose told petitioner that "they had 'to get rid of' Martino" because she knew about the crime ring and had "loose lips." Petitioner had a sexual relationship with Martino.

Petitioner drank a six-pack of beer and went to Martino's trailer, where he had sexual intercourse with her. While Martino was giving water to her cats, petitioner "walked up behind her and hit her with his fist on the back of the head." Petitioner "struggled with [Martino], took her behind the trailer, threw her on the ground, grabbed her around the neck, [and] choked her until she passed out." Petitioner then "tied Martino up with electrical cord . . . , rolled her up in a blanket, and threw her in the back of [a] truck." Petitioner drove the truck to a ditch filled with water. He unrolled the blanket and threw Martino into the ditch. Petitioner claimed that, when he threw Martino into the ditch, he believed that she was dead. But Martino was still alive and drowned in the ditch.

### Petitioner's Insight into the Commitment Offense

In 2008 petitioner told Dr. Barron that "the underlying cause" of his commission of the murder was his "perceived inadequacies." His feelings of worthlessness were exacerbated when his wife "left [him] for a male stripper." "He reported he coped with this by 'drinking a lot and using drugs.'" He was "definitely intoxicated" when he murdered Martino.

Dr. Barron wrote: "In describing his thoughts just prior to the crime, [petitioner] stated, 'I was told to do it. I felt I was forced into it. I put myself into that situation. I remember not knowing what to do, should I do this? I think when I committed the crime it was more for acceptance. I wanted to show how I could be relied upon.' Further, [petitioner] said that by the time of the crime, 'I had compromised my morals so much the decision didn't mean anything at the time.'"

Petitioner told the Board that he had "just lost it" after his wife left him. He started using drugs and alcohol. He "got into cocaine and . . . tried LSD

and all kinds of weird combinations." He also smoked marijuana. He sold "a little bit" of cocaine to "service guys."

Petitioner acknowledged to the Board that his "drug addiction and alcoholism is not an excuse" for his murder of Martino. But the drugs and alcohol contributed to his commission of the crime: "[I]f you take away the drugs, you take away the alcohol, you take away [Rose's] influence, I wouldn't have done it on my own. I would have never thought of anything like this."

### Petitioner's Remorse

Petitioner declared to the Board: "I killed [Martino], and I am honestly ashamed of what I've done. And I wish I could apologize to her. I wish I could apologize to her family. I've ruined their lives, I've ruined my family's lives, [and] I've ruined my own life . . . ."

In 2008 Dr. Barron wrote: "Regarding his current feelings about the crime, [petitioner] said, 'There is no way to describe it. I know I was wrong. I feel like an idiot. I should have been stronger, [and] stood up and said that shouldn't happen.' . . . He reported he has experienced remorse which he feels 'every day' and described it as 'a deep pain in my chest, sadness.' When asked who was to blame for the crime he stated, 'I am to blame.' "

Petitioner's 1982 probation report stated: "[Petitioner] shows a great deal of remorse in his actions. He did talk about having periods of guilt in which he could not sleep, eat or concentrate on anything."

### Petitioner's Criminal Record

Petitioner has no juvenile record. As an adult, he has one conviction in 1980 for drunk driving. After the murder of Martino, petitioner told law enforcement officials "that he had been involved in a number of burglaries in the barracks on the base [(Fort Ord)]" where he had been stationed. Petitioner "said that he was stealing property and taking the property to Herman Rose's residence . . . ."

### Petitioner's Vocational Training and Rehabilitation

The Governor declared: "[Petitioner] made efforts to enhance his ability to function within the law upon release. He earned an Associate of Arts degree and a Bachelor's degree. He received training in vocational welding, shoemaking, radiology, electronics, and in auto shop, where he is currently a teacher's aide. He also availed himself of an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, Anger Management,

Lifers Group Therapy, Christian 12 Step, Rational Behavior Training, and Yokefellow Counseling Program. [Petitioner] is currently the co-facilitator of the Alcoholics Anonymous and Narcotics Anonymous weekly meetings. He is also active in the Christian faith, and he participates in the Youth/Adult Awareness Program and the Recreation Aide Program. In addition, he received several laudatory chronos from correctional staff, along with favorable reports from various mental health professionals. [¶] Petitioner also established and maintained seemingly solid relationships while in prison. He made plans to live in a Christian-oriented recovery center in Placer County, the county to which the Board approved his parole."

The Board noted that petitioner had a "certification in Radiology" and had worked for "about eight years in Radiology." Petitioner told the Board that he had "a current X-ray license" and was presently the teaching assistant in vocational welding. Petitioner said that he "got all the certifications . . . for Automotive, too."

### Petitioner's Alleged Prison Misconduct

According to the Governor, petitioner "was counseled twice for misconduct, most recently in 1988." According to Dr. Barron, "[w]hile incarcerated . . . [petitioner] has not been issued any Rules Violation Reports . . . or Custodial counselings . . . ." The Board stated that petitioner had one "CDC 128" in December 1986 "for conduct," and one in October 1988 "for unissued property." The Board did not explain the significance of a CDC 128. Nor did it set forth the facts underlying the two CDC 128 incidents. The Board characterized petitioner's prison conduct as "exemplary."

### Psychological Evaluation: Risk of Future Violence

In his 2008 psychological evaluation of petitioner, Dr. Barron opined: "[Petitioner's] current risk for future violence, if paroled to the community at this time, is in the low range, when compared to other inmates. However, his risk for future violence may significantly increase if he were to once again suffer from feelings of worthlessness and inadequacy and began to identify with a criminal lifestyle and/or use substances in a maladaptive attempt to cope with these negative feelings. If the latter scenario developed, given his history, it is possible that he may engage in criminal/aggressive behavior, which could potentially lead to life-threatening violence. However, it should be noted that this scenario is hypothetical and there are no current warning signs that such a situation is forthcoming. Further, it is noteworthy that [petitioner] apparently does not currently associate with prison gang culture and has not engaged in violent behavior since his arrest for the controlling offense. This suggests he may have the experience and motivation necessary

to continue this apparent pro-social stance if released into the community." Dr. Barron "noted that there is no evidence [petitioner] has used any substances, including alcohol since 1982."

*Governor's Decision*

The Governor concluded that petitioner's "release from prison would pose an unreasonable risk of danger to society" because of the aggravated circumstances of the commitment offense, Dr. Barron's hypothetical scenario of future dangerousness, petitioner's history of substance abuse, and his lack of a confirmed job offer. The Governor reasoned as follows: "[T]he first-degree murder for which [petitioner] was convicted was especially heinous because it was, as the 2008 Board remarked, an 'execution style' murder committed in a 'cruel and callous' manner. Moreover, the 2006 Board noted his apparent motive for the murder—to curry favor with Herman Rose—was extremely trivial in relation to the magnitude of the crime he committed. [Martino] was particularly vulnerable when [petitioner] murdered her. They had just had sex and she was giving water to her cats when he attacked. He choked her into unconsciousness and dumped her in a ditch, leaving her to drown, demonstrating a particularly callous disregard for her life and suffering. [¶] There is also information in the record indicating that [petitioner's] risk for future violence could increase if he feels inadequate or if he once again uses alcohol or drugs. [Petitioner] told his 2008 mental-health evaluator [(Dr. Barron)] that the primary factor that led to his criminal behavior was his 'perceived inadequac[y].' The evaluator said that '[petitioner] has been involved in activities designed to ameliorate criminal, psychological, social, and vocational problems,' but added that his risk for future violence 'may significantly increase if he were to once again suffer from feelings of worthlessness and inadequacy and began to identify with criminal lifestyle and/or use substances in a maladaptive attempt to cope with these negative feelings.' This information of increased risk, when considered with the gravity of the murder, [petitioner's] significant history of substance abuse, and his lack of a confirmed job offer, indicates to me that [petitioner] would pose an unreasonable risk to public safety if released from prison at this time."

As to the "lack of a confirmed job offer," the Governor noted: "A letter was submitted indicating [petitioner] would be a candidate for metal work, but no job offer has been confirmed. Having a means to support himself will be essential to his success on parole."

*Superior Court Habeas Corpus Proceeding*

Petitioner sought a writ of habeas corpus in the San Luis Obispo County Superior Court. After issuing an order to show cause, the superior court

denied habeas corpus relief. The court reasoned as follows: "The Governor has examined the motivation for the petitioner's commitment offense, specifically the fact that the petitioner perceived himself as inadequate. This sense of inadequacy becomes exacerbated by the use of drugs and alcohol. As the Governor notes, if the petitioner begins once again to identify with a criminal lifestyle or uses substances, e.g. drugs or alcohol, his risk of violence significantly increases. Notwithstanding the significant gains made by the petitioner, (referring to the use of drugs and alcohol and the stabilization of his self-worth), [t]he Governor in essence concludes that without employment the petitioner's sense of inadequacy could again arise leading him to drugs and alcohol and a direction toward criminal activity. With these factors as a basis for violence the Governor concludes that the petitioner posses [*sic*] an unreasonable risk to public safety. [¶] Notwithstanding the fact that the court may disagree with the Governor, it cannot say that this conclusion, based on the record, is unreasonable. Because of the for[e]going, the court finds that the Governor's decision to reverse the Board is not arbitrary or capricious and that there is 'some evidence' in the record to support his decision."

### *Standard of Review*

"[T]he Governor undertakes an independent, de novo review of the inmate's suitability for parole. [Citation.]" (*In re Lawrence* (2008) 44 Cal.4th 1181, 1204 [82 Cal.Rptr.3d 169, 190 P.3d 535].) The Governor "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation. [Citation.]" (*Id.*, at p. 1219.) In reviewing the Governor's decision to reverse the Board's determination that an inmate is suitable for parole, the standard of review is "whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." (*In re Lawrence, supra*, 44 Cal.4th at p. 1191.) The "some evidence" requirement has also been expressed as "a modicum of evidence." (*Id.*, at p. 1226.)

"Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174].)

"This standard is unquestionably deferential, but certainly is not toothless, and 'due consideration' of the specified factors requires more than rote

recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*In re Lawrence, supra,* 44 Cal.4th at p. 1210.)

### *Factors Relevant to Parole Suitability*

"The . . . criteria for setting parole dates for individuals convicted of murder committed after 1978, as in the present case, are set forth in title 15, division 2, chapter 3, article 11 of the California Code of Regulations." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 653.) "According to the applicable regulation [(Cal. Code Regs., tit. 15, § 2402)], circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. [Citation.] [¶] The regulation further provides that circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. [Citation.]" (*In re Rosenkrantz, supra,* 29 Cal.4th at pp. 653–654, fn. omitted.)

### *Some Evidence Does Not Support the Governor's Determination That Petitioner Is Unsuitable for Parole Because He Is Currently Dangerous*

Pursuant to the applicable regulation, the only circumstance tending to establish unsuitability for parole is that petitioner "committed the offense in an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) "Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense;

(D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. [Citation.]" (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 653, fn. 11.)

Petitioner clearly committed the murder of Martino in "an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) The offense was an execution-style murder that demonstrated an exceptionally callous disregard for human suffering. Moreover, as the Governor noted, petitioner's "apparent motive for the murder—to curry favor with Herman Rose—was extremely trivial in relation to the magnitude of the crime he committed."

But "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*In re Lawrence, supra*, 44 Cal.4th at p. 1214.) Here the Governor concluded that the aggravated nature of petitioner's commitment offense remained probative of current dangerousness based on Dr. Barron's 2008 psychological evaluation, petitioner's "significant history of substance abuse, and his lack of a confirmed job offer."

The Governor focused on Dr. Barron's statement that petitioner's "risk for future violence may significantly increase if he were to once again suffer from feelings of worthlessness and inadequacy and began to identify with a criminal lifestyle and/or use substances in a maladaptive attempt to cope with these negative feelings." The Governor omitted the qualifier that follows this statement: "However, it should be noted that this scenario is hypothetical and there are no current warning signs that such a situation is forthcoming. Further, it is noteworthy that [petitioner] apparently does not currently associate with prison gang culture and has not engaged in violent behavior since his arrest for the controlling offense. This suggests he may have the experience and motivation necessary to continue this apparent pro-social stance if released into the community." Dr. Barron further asserted: "There was no evidence in the current interview that [petitioner] is an imminent threat for future violence." In addition, Dr. Barron noted that petitioner "reported he did not currently have feelings of either worthlessness or hopelessness . . . ."

Thus, Dr. Barron's hypothetical scenario of future violence was based on speculation of a "worst case, what if scenario." Dr. Barron pointed out that

"there are no current warning signs . . ." that petitioner would be dangerous if he were released into the community. Indeed, according to Dr. Barron, all of the current signs are positive. Dr. Barron declared: "[P]etitioner has been involved in activities designed to ameliorate criminal, psychological, social, and vocational problems, which have included his vocational work assignments and participation in 12 step meetings. His continued involvement in these programs suggests a willingness and motivation to benefit from these activities. Moreover, in the current interview [petitioner] expressed insight into what led to his previous criminal behavior, and explained how he has modified his thinking and behavior towards a more pro-social and optimistic stance. Evidence of this can be found in the lack of Rules Violation Reports during the past 26 years and in his responsible work behavior. Further, there was no evidence that [petitioner] has in recent years exhibited the type of impulsivity and aggressiveness that was a factor during the controlling offense. [¶] . . . [Petitioner's] documented responsible work performance, participation in self-help groups, and his lack of disciplinary actions during the past 26 years indicates he has an understanding of what is needed in order to succeed, as well as a willingness to accept and make use of vocational/therapeutic programs and comply with supervision. . . . An additional benefit to [petitioner], if he were to be released into the community, is the apparent support of his family and friends, who have offered housing and financial assistance as well as emotional support." Dr. Barron observed that petitioner's score on a test of psychopathic personality traits, "when compared to other inmates, ranked in the very low range (1.3 percentile), which is to say that based on a normative sample of 5,408 North American male offenders his score was lower than approximately 99 percent of those offenders."

■ "[B]oth the governing statutes and constitutional due process principles require the Governor to base his decision to set aside a grant of parole on 'some evidence' of *current* dangerousness." (*In re Lawrence, supra*, 44 Cal.4th at p. 1227, italics added.) The "some evidence" standard cannot be satisfied by Dr. Barron's hypothetical scenario of future violence for which "there are no current warning signs . . . ."

Nor can the "some evidence" standard be satisfied by the Governor's reliance on petitioner's "significant history of substance abuse." Dr. Barron observed "that there is no evidence [petitioner] has used any substances, including alcohol since 1982." Dr. Barron took note of petitioner's substantial efforts to maintain his sobriety: ". . . [Petitioner] has continued as the 'co-facilitator for the Enhanced Outpatient Alcoholics/Narcotics Anonymous' weekly meetings, a position he has held since the beginning of 2001. Information and laudatory chrono documented that from July 2005 through December 2007 [petitioner] 'demonstrated extraordinary dedication, not only to this program, but to its participants,' and 'his knowledge and dedication to

the 12 step recovery process has served this program far beyond the original expectations.' " Petitioner told the Board that for 20 years he had been attending Alcoholics Anonymous and Narcotics Anonymous meetings. The Board's decision to grant petitioner parole was based in part upon his commitment to participate in "a comprehensive drug and alcohol relapse prevention counseling program." The Board required petitioner to submit to alcohol, narcotics, and THC (marijuana) testing.

Finally, petitioner's "lack of a confirmed job offer" does not support the Governor's finding of current dangerousness. Petitioner should not be penalized because of the high unemployment rate and because his incarceration makes it impossible for him to apply for job openings. Petitioner's employment prospects appear to be favorable. The Governor noted that he had developed marketable skills through training received "in vocational welding, shoemaking, radiology, electronics, and in auto shop." Petitioner was a state "certified Radiology technologist" with eight years of experience in that field. A construction company wrote a letter saying that it would consider offering him a job in "metal work, general labor category." An employee of the construction company "offered assistance by 'mentoring him in both personal and vocational development.' "

Petitioner's development of "marketable skills that can be put to use upon release" was a factor tending to establish his suitability for parole. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) Other factors also tended to establish parole suitability. Petitioner has no juvenile record, no history of violent crime, and his only other conviction was for drunk driving. He also has a stable social history. The Board declared: "We note that part of our decision [to grant parole] came as a result of your lack of criminal history as a juvenile. . . . People that have long criminal records tend to be mentally entrenched in that kind of lifestyle; that wasn't the case here. . . . You had a stable social history. . . . [Y]our parents were together, family seemed to be an appropriate family, not the kind that give[s] rise to their children acting in unreasonable ways. You've maintained contact with at least your mother and sister, and your brothers seem to be as supportive as they can be to you; that weighed in our decision." The Board also considered that petitioner had shown signs of remorse and had gained insight into why he had committed the murder. Furthermore, the Board found that petitioner's "participation and behavior in prison . . . has been exemplary."

### Governor's Request for Remand

"The Governor contends that we should remand this matter to him for further review. He does *not* contend that there is any new evidence or any additional basis upon which his decision to reverse the Board's decision

could be upheld. [¶] . . . 'Because we have reviewed the materials that were before the Board and found no evidence to support a decision other than the one reached by the Board, a remand to the Governor would amount to an idle act. [Citation.]' [Citation.]" (*In re Dannenberg* (2009) 173 Cal.App.4th 237, 256 [92 Cal.Rptr.3d 647].)

*Conclusion*

"When, as here, all of the information in a postconviction record supports the determination that the inmate is rehabilitated and no longer poses a danger to public safety, and the Governor has neither disputed the petitioner's rehabilitative gains nor, importantly, related the commitment offense to current circumstances or suggested that any further rehabilitation might change the ultimate decision that petitioner remains a danger, mere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*In re Lawrence, supra*, 44 Cal.4th at pp. 1226–1227.)

Here, the Governor has failed to articulate a rational nexus between the circumstances of petitioner's commitment offense and his conclusion of current dangerousness. Instead, the Governor speculated about a possible "what if" scenario that could lead to petitioner's commission of acts of violence. What if petitioner " 'were to once again suffer from feelings of worthlessness and inadequacy and began to identify with criminal lifestyle and/or use substances in a maladaptive attempt to cope with these negative feelings[?]' " But as Dr. Barron observed, "there are no current warning signs . . ." that such a scenario would occur. Petitioner's rehabilitative efforts militate against the probability of a relapse.

If we upheld the Governor's conclusion in this case, he would have carte blanche in practically every case to overturn the Board's decision granting parole. The Governor cannot foretell future events and his attempt to do so, based upon the feeble rationale stated, cannot constitute the requisite "some evidence" of current dangerousness.

We implore the Governor and his staff to pause and reflect upon these miniature constitutional crises foisted upon the judiciary. We take no pleasure in "overruling" the Governor in a parole case. But we are obligated to follow the law and vindicate the rule of law given to us by the Legislature and our

Supreme Court. In reviewing parole cases, we exercise restraint. We have expressly recognized that the Governor "sits as the trier of fact and may draw reasonable inferences from the evidence." (*In re Smith* (2009) 171 Cal.App.4th 1631, 1639 [90 Cal.Rptr.3d 400].) At oral argument, respondent stated that our holding in *In re Smith* dictates denial of the instant writ petition. But here, the Governor is not drawing rational inferences. He is speculating, i.e., guessing. (See *People v. Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843].) "Somewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails. When this happens, the inference becomes irrational speculation." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 369 [100 Cal.Rptr.2d 845].) Based upon the instant record, there is no way that the Governor can be upheld on the rationale stated.

Pursuant to rules established by the Legislature and our Supreme Court, parole is available for petitioner. We could easily live with a contrary rule prohibiting parole in this situation. But this is not our call. Nor is it the Governor's call. The logical effect of the Governor's reversal of the Board's granting of parole, absent judicial intervention, is that petitioner will never be released on parole. This denigrates the rule of law. There is always a chance that a parolee will reoffend if released from prison.

In the past several years, there have been too many instances where conscientious trial courts and panels of the Court of Appeal, from a variety of backgrounds and views, have, in reasoned analyses, "overruled" the Governor. This ever-growing body of judicial decisions should give the Governor pause. The courts do not, and will not, shrink from their duty. It seems to us that the Governor is spending too much time and effort on "second-guessing" parole suitability determinations made by experts in the field of penology. There is no question but that the Governor has the power and right to reverse parole board rulings that allow release. This does not mean that the Governor should do so with frequency. The public is entitled to presume, and our experience has shown, that the Board takes its job seriously and does not "willy-nilly" grant parole. For the most part, the Board is made up of persons with law enforcement experience. It grants parole in a very small percentage of cases for a good reason or reasons. The Governor's repeated disagreement with the Board does little to foster faith in its expert judgment.

We are hopeful that the Governor will reconsider his views and moderate them so as to restore confidence in the Board's determinations. In this way, the rule of law, which provides for parole here and in other cases, will be vindicated.

*Disposition*

The petition for writ of habeas corpus is granted. The Governor's order reversing the Board's 2008 decision granting petitioner parole is vacated, the Board's parole release order is reinstated, and petitioner is ordered released from custody on parole.

Coffee, J., and Perren, J., concurred.