[No. A127641. First Dist., Div. Three. Oct. 7, 2010.]

In re JAMES PARRIS POWELL on Habeas Corpus.

COUNSEL

Susan L. Jordan, under appointment by the Court of Appeal, for Petitioner James Parris Powell.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Steven G. Warner, Deputy Attorneys General, for Respondent State of California.

OPINION

**POLLAK, Acting P. J.**—In April 1982 petitioner James Parris Powell was convicted of two counts of second degree murder and the use of a deadly weapon and sentenced to 16 years to life in state prison. On May 6, 2009, the

Board of Parole Hearings (Board) again determined that petitioner is unsuitable for parole because he poses a present risk of danger to society or a threat to public safety if released. Because we conclude the Board's decision was not supported by "some evidence" we reverse that decision and remand the matter to the Board to conduct a new parole-suitability hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the commitment offense Powell and his girlfriend, Sherby Williams, had been together for three years.[1] Powell describes their romance as a "love/hate" relationship, in which they partied and drank together and he sometimes abused her. They broke up several times, but always got back together. Three days before the commitment offense they had a fight and Williams told Powell "to leave and not come back." Powell assumed that, as before, everything would be resolved in a few days. As he had done previously, he stayed briefly with his aunt. After a few days' separation, Powell telephoned Williams to ask what they were going to do that evening. She responded that she and some girlfriends were going to Reno. After work, Powell drank an unspecified, but significant, amount of alcohol, smoked some marijuana, and returned to his aunt's house to sleep.

At approximately 1:30 early Saturday morning, May 16, 1981, Powell awoke and decided to go to Williams's house to drink. Arriving at the house, he noticed that her car was in the driveway, but assumed she had gone to Reno in a friend's vehicle. When he entered the house, he observed that the television and fish tank light were on. Entering the darkened bedroom, he accidentally kicked a baseball bat, awakening a man, Darryl Carson, who was in bed with Williams. The two men struggled for the bat. As they fought, Williams, whom Powell at first did not see, was struck by the bat. When Williams said something, Powell realized she was there, and he intentionally struck her with the bat. Powell continued to fight Carson and hit him "until he hit the wall." Powell then left the house while Williams was crying; Carson was "falling off the nightstand on which he had been sitting." After leaving the crime scene, Powell called the Richmond Police to report a burglary. He then drove to Berkeley and called the Berkeley police, but hung up when he was put on hold. He went to Reno for the weekend. When he

---

[1] The record is unclear as to whether Powell and Williams lived together. In the April 1999 life-term inmate evaluation, Powell is quoted as saying that they lived together. According to petitioner's 1981 statement to police, however, he never lived with his girlfriend, but spent nights at her home during their three-year relationship. He unquestionably had two keys to Williams's residence.

returned, his relatives told him that two bodies had been found at Williams's house. Powell walked to the crime scene and was arrested.

Powell was born in 1950, the third of seven children raised by his natural parents. He graduated from high school in 1968.[2] He volunteered for the Marine Corps and served in Vietnam for one year, receiving an honorable discharge in 1970. From 1970 or 1971 until his current incarceration he worked as a forklift operator for a roofing company.

Powell married his second wife, Gwendolyn, shortly after he was incarcerated. His first marriage ended due to his infidelity. He had two children with another woman, Virginia, whom he never married. He is in regular contact with his second wife and her two children, whom he regards as his stepchildren, and with his ailing mother and surviving siblings.

Powell began to drink alcohol at the age of 17. He started drinking heavily when he was discharged from the Marines. Typically he drank one and one-half quarts of rum each week—and sometimes more on the weekends.[3] He also occasionally used marijuana and cocaine. On the day of the commitment offense he had been drinking "quite a bit." He had also smoked some marijuana. Nonetheless, he did not feel that he was then under the influence of either alcohol or drugs.

In March 1978, Powell was convicted of petty theft and served 10 days in county jail. In December 1978, he was arrested for carrying a concealed weapon and carrying a loaded firearm in a public place, but those charges were dismissed. In March 1981, he was arrested for assault with a deadly weapon. The victim of that assault was Williams, whom he killed the following May.

Since being incarcerated in 1982, Powell has received one serious rules violation report (for work performance), in January 1985. He also was counseled twice, most recently in 1987—both times for his work performance. None of his in-custody discipline has been for criminal or violent behavior.

---

[2] In 1995 he scored at the 12.2 total grade placement level on the test for adult basic education. Since being incarcerated, he has taken some college courses, but has not earned any postsecondary degrees.

[3] The substance abuse history is based on Powell's self-reports, which vary somewhat. The quantities mentioned above are based on statements he made to a psychological evaluator in 1999. In 2009, he reported that when he was drinking alcohol the most he consumed was three to four beers daily in addition to a half-pint of rum over the course of a week.

Powell's participation in available self-help programs has been exemplary. Since 1988 he has participated in various substance abuse programs, including Alcoholics Anonymous, Narcotics Anonymous, and a substance abuse program. He participated in a "Category T" program,[4] designed to address domestic violence and anger, until the program was discontinued. He has completed two "Lifer Programs" dealing with stress reduction and anger management, as well as a series of individual psychotherapy sessions. In 1993, the Board recommended individual psychotherapy to explore whether he harbors "any possible antagonism or hatred toward women." The evaluating psychologist concluded: "Mr. Powell's presentation demonstrated convincingly that no such propensity had been involved in the committing offense. In addition, the sessions were deemed very useful in helping Mr. Powell to more fully understand his motivations at the time. They also permitted considerable discussion of issues relating to past excessive alcohol use. During the clinical interview it was again apparent that Mr. Powell has matured admirably and, while he wondered if additional Category X or T programming might be recommended by the Board, such does not seem at all indicated."[5] He has also completed numerous other programs including the parole recidivism prevention program, creative conflict resolution, anger management, family relationship education enrichment program, the art of communication, and Bible studies. In addition, Powell has upgraded educationally and vocationally. He has earned 32 units towards an associate of arts degree and completed vocational certificates in furniture upholstery, the prison industry authority mattress factory, and watch repair. He has work experience as the lead in the prison industry authority upholstery factory, as a clerk for the associate warden, and as a porter.

Since 1989, Board-appointed psychologists have consistently described his risk of future violence as "below average," "significantly below average," and a "low risk" if released into the community. One report, in the course of discussing Powell's history of alcohol abuse, concludes "After years of incarceration Inmate has essentially mastered these problem areas and presents as much lower risk. Were he to be paroled he would . . . very likely continue his present gains."

Powell's most recent psychological evaluation in 2009 gives him two "Axis I" diagnoses: alcohol abuse, by history and adult antisocial behavior.

---

[4] A Category T program is for male inmates with identified psychiatric problems requiring outpatient group therapy. (Dept. of Corrections and Rehabilitation, Operations Manual (Jan. 2010) Adult Classification, § 62080.12, p. 575.)

[5] A "Category X" program is a 90-day psychiatric or psychological evaluation program. (Dept. of Corrections and Rehabilitation, Operations Manual, *supra*, Adult Classification, § 62080.11, p. 575.)

He carries no Axis II diagnosis.[6] His most recent psychological assessment used three different scales to assess his violence potential if released: the psychopathy checklist (revised), to assess general psychopathy when compared with other male offenders, the Historical-Clinical-Risk Management–20, to measure his risk for violent recidivism, and the level of service/case management inventory, to evaluate the general risk of recidivism. On each scale he scored in the low range. Overall, the evaluating psychologists opined that Powell presents "a relatively low risk for violence in the free community." The psychologists recognized that if he were to resume his prior substance abuse, his risk of aggressive or violent behavior would increase, but acknowledged that his ongoing vocational activities with positive evaluations coupled with his ongoing abstinence from drug and alcohol use (as shown by a lack of discipline for substance-abuse-related offenses and ongoing negative drug test results) supported Powell's "commitment to sobriety and a clean lifestyle." The evaluators also noted that Powell did not respond to questions impulsively; neither did he avoid questions he was asked or respond glibly or superficially.

As with the consistent evaluations of Powell's low potential for future violence, the many psychological evaluations over the years have agreed that Powell accepts responsibility and is genuinely remorseful for his life crimes. The earliest evaluation in the record, from 1989, states that "Mr. Powell showed remorse when relating the story of the instant offense, and his remorse and understanding of his crime appears to be rooted in his religious faith." The 1990 evaluator commented that he "does not try to avoid responsibility for his crime by blaming his use of alcohol or drugs. In fact he takes responsibility for what he did, and is not resentful for being in prison. . . . [¶] . . . He is candid about the crime, shows remorse, and obviously has done a great deal of thinking about this grievous mistake." The 1992 report discusses Powell's response to psychotherapy: "It was clear that he had been actively involved and actually learned from it. He was enthusiastic about the therapy, and was able to list 2 or 3 specific ways in which he gained psychologically from the program. [I]t was clear that he had gained considerable self-insight." In 1997, the evaluating psychologist described Powell's "demeanor [as] one of a thoughtful man who responsibly does his program in prison. He readily admits to the murders and the tragic consequences for all involved. He discusses his alcohol abuse and immaturity at that time. In prison, Inmate clearly has made a positive life change in coming

---

[6] An Axis I diagnosis is a diagnosis of clinical, learning and developmental disorders. (Using classifications of Am. Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000 text rev.).) An Axis II diagnosis is a diagnosis of a personality disorder. (*Ibid.*)

to grips with himself and is repentant. Not only has he determined to change his life, but over time has shown that he has made a positive change in his behavior, attitude and adjustment." The 1999 evaluation states, "He says that he used to convince himself that since he didn't mean to kill Sherby or Mr. Carson, that the murders were an accident. However, in therapy he was made to realize it was no accident that the two people were murdered. He stated, 'It wasn't right. I wish it never happened. Even if she and I would never be together again.' He added, 'I still think of Sherby today. I still say a prayer for her mother, sister, brother and daughter and for Mr. Carson's family. They didn't deserve it.' " The most recent psychological evaluation in 2009 concludes: "Mr. Powell acknowledged adequate insight into how aspects of his criminal thinking and poor relationship boundaries led to his anger and rage and, ultimately, the life crime. His expressed emotions about the murders of his ex-girlfriend and her new boyfriend appeared affectively based, rather than a superficial, intellectual understanding of such emotions or a more self-focused understanding of how the life crime has affected him." Thus, for more than 20 years psychologists who have assessed Powell have indicated that he is remorseful about his life crime and has developed insight into the circumstances of the crime.[7]

If paroled, Powell intends to live with his wife in Richmond, California. He has contacted a program, Inside Solutions, for assistance in finding a job. He has offers of support from various family and friends, including promises of general emotional support and assistance with transportation, employment, housing, and finances. In addition, he has vocational certificates in furniture upholstery, mattress factory, and watch repair. He also has skills as a forklift operator and clerical worker.

Finally, Powell also presented the Board with an outline for his first two years after he is released which, in six-month segments, highlights the major activities he anticipates. These begin with adhering to parole requirements, maintaining a good living environment, employment and strong family and church ties, to ultimately increasing his involvement in community activities such as working with at-risk children, the Job Corps, and Community Watch.

---

[7] Although all of these psychological assessments of Powell's insight into his life crime are positive, the 2009 evaluator noted that although Powell acknowledged the reality of the daily stressors he would face if released, "he did not appear to have a realistic expectation for how intense this level of stress may be. He pointed out that his improved coping skills, which he has developed during his lengthy incarceration, along with his spirituality and faith, will aid him in learning to adjust to living with his wife, and that a healthy romantic relationship will experience conflict and stress from time to time."

On May 6, 2009, the Board denied Powell parole for three years.[8] The Board found that the commitment offense was especially heinous, atrocious and cruel, involving two murder victims. The Board considered the motive to be trivial. It deemed his prior social history to be unstable because he had been arrested twice before committing his life crime, because he had previously abused his girlfriend, and used drugs and alcohol. It also considered his insight and acceptance of responsibility to be deficient because he supposedly continues to claim that the murders were accidental. Finally, although describing Powell's parole plans as "well thought out," the Board recommended that he take advantage of a transitional housing program offered by Veterans Affairs and that he develop a backup plan to maintain his sobriety because he intended to attend an Alcoholics Anonymous group distant from his intended future home.

Powell filed a petition for a writ of habeas corpus in the Contra Costa County Superior Court, which was denied on February 2, 2010. The superior court agreed with the Board that the "negative factors—petitioner's attempt to minimize his behavior combined with the circumstances of the commitment offense, his history of violence, his unstable social history, and his limited parole plans in terms of managing his substance abuse amply support the conclusion that the petitioner remains a current threat to public safety."

On February 22, 2010, Powell filed the instant petition for a writ of habeas corpus. After requesting informal briefing, issuing an order to show cause, and hearing oral argument, we now remand the matter to the Board for a decision consistent with this opinion.

### DISCUSSION

I. *The Commitment Offense and Powell's Unstable History Are Too Remote to Remain Valid Predictors of His Conduct if He Is Released.*

For a parole denial to withstand judicial review, due process requires that "some evidence" support the conclusion that the inmate would currently pose a danger to society if released. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1191 [82 Cal.Rptr.3d 169, 190 P.3d 535]; *In re Shaputis* (2008) 44 Cal.4th 1241, 1254 [82 Cal.Rptr.3d 213, 190 P.3d 573].) Although this is a deferential standard, our review must be "sufficiently robust to reveal and remedy any evident deprivation of constitutional rights." (*In re Lawrence*, at p. 1211, citing *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664 [128 Cal.Rptr.2d 104, 59 P.3d 174].) "[R]ote recitation of the relevant factors" without adequate

---

[8] The Board noted that there is a mechanism for petitioner to seek review sooner than three years and indicated that would be appropriate in this case.

reasoning to establish a "rational nexus" between the cited factors and the conclusion that someone poses a current danger is an inadequate basis for denying parole. (*In re Lawrence*, at p. 1210.) Thus, when the Board or Governor fails to articulate an appropriate nexus between the relevant factors and their assessment of dangerousness, the denial of parole cannot be sustained. (See, e.g., *In re Calderon* (2010) 184 Cal.App.4th 670, 687 [109 Cal.Rptr.3d 229]; *In re Loresch* (2010) 183 Cal.App.4th 150, 163 [107 Cal.Rptr.3d 331]; *In re Lazor* (2009) 172 Cal.App.4th 1185, 1203 [92 Cal.Rptr.3d 36]; *In re Rico* (2009) 171 Cal.App.4th 659, 686–687 [89 Cal.Rptr.3d 866]; *In re Burdan* (2008) 169 Cal.App.4th 18, 38–39 [86 Cal.Rptr.3d 549]; *In re Singler* (2008) 169 Cal.App.4th 1227, 1230–1231 [87 Cal.Rptr.3d 319]; *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1488–1491 [86 Cal.Rptr.3d 498].)

Here the commitment offense was committed approximately 28 years before the Board hearing; Powell's earlier criminal history and history of domestic abuse are more distant. From his discharge from the Marines in 1970 through the commitment offense he abused alcohol, and sometimes drugs. Since that time, however, numerous psychological evaluators have agreed that he has dramatically changed his attitude and his behavior. Over the last 29 years while incarcerated he has committed no violent or assaultive act, nor has he abused drugs or alcohol. The Board acknowledged Powell's history of affirmatively engaging in constructive activities: upgrading his education, earning "very positive work chronos," obtaining vocational training in three different fields, and actively participating in a wide range of self-help programs. Thus, more than the passage of time and Powell's associated aging render these precommitment factors too remote to be reliable predictors of his future behavior. In the intervening years, Powell has credibly demonstrated that he has adopted a radically different lifestyle. It is not surprising that the Board failed to articulate a rational nexus linking these precommitment factors to the likelihood of future dangerousness. Given Powell's intervening conduct, there is none. Absent such a rational link, these factors do not support a finding that Powell would pose an unreasonable risk of future dangerousness if released. (E.g., *In re Burdan, supra*, 169 Cal.App.4th at pp. 38–39; *In re Singler, supra*, 169 Cal.App.4th at p. 1244.)

II. *Powell's Insight and Acceptance of Responsibility Do Not Support the Parole Denial Decision.*

Despite the fact that insight is not listed among the criteria the Board is to consider in determining whether an inmate is suitable for parole (see Cal. Code Regs., tit. 15, §§ 2281, 2402), since the decision in *Shaputis*, the Board has routinely invoked lack of insight to justify a finding of unsuitability. (*In re Calderon, supra*, 184 Cal.App.4th at p. 689, fn. 6.) *Shaputis* articulates the

principle that the Board may rely on static factors to support an unsuitability finding only if there is a rational basis for concluding " 'that an inmate *continues* to pose an unreasonable risk to public safety.' " (*In re Shaputis, supra,* 44 Cal.4th at p. 1255.) In that case, the inmate's history of domestic violence (an immutable characteristic) was regarded as a valid indicator of current dangerousness in part because of his inability "to gain insight into his antisocial behavior." (*Id.* at p. 1260.) There was objective evidence in that case that fully supported such a finding. (*Ibid.*)

Acceptance of responsibility also is not listed in the regulatory factors the Board is to consider in determining parole suitability. (See Cal. Code Regs., tit. 15, §§ 2281, 2402.) It is, however, closely related to showing signs of remorse, one of the factors tending to show suitability for parole. (*Id.,* §§ 2281, subd. (d)(3) [which considers whether "the prisoner has given indications that he understands the nature and magnitude of the offense"], 2402, subd. (d)(3).)

In determining that Powell lacked sufficient insight and acceptance of responsibility for his actions, the Board misconstrued his statements explaining the crime. The Board faulted Powell for stating that he "didn't intend to hit anybody" when he did intend to hit both victims. "Sir, you have to come right out with it and say that you beat them to death with a baseball bat because you lost control, you have to do that." That, however, is exactly what Powell has been acknowledging for many years. Both at the parole hearing and in his earlier statements to psychological evaluators, Powell has stated repeatedly that when he entered the house he did not intend to hurt anyone; indeed, he did not even know that Williams or Carson was there. When he entered the bedroom he still had no such intent. When Carson arose, after Powell accidentally kicked the baseball bat that was in the room, the two struggled for control of the bat and Powell accidentally hit Williams. After the struggle began and Williams called out to him, he has consistently acknowledged that his jealousy and anger overwhelmed him and he deliberately bludgeoned the two victims to death.

This version of events is consistent with what he told the probation officer in 1982. The probation report states: "[Powell] reports that when he entered the bedroom he went to the side of the bed where Ms. Williams normally slept. He kicked the bat, picked it up and was going to take it to the dining room. However, Mr. Carson jumped up. At that point the defendant had the bat in his hand and swung it slightly. He explains that he did not intend to hit anyone *at that time.* He felt that Mr. Carson pushed at the bat, and as a reaction the defendant accidentally hit Ms. Williams. He then hit Mr. Carson twice. He hit Ms. Williams and kept hitting her."

Since as far back as 1989, Powell has acknowledged that although "he was initially fearful as he and the other man began to scuffle," the "fear gave way to anger as the incident progressed." In 1999, he told the psychological evaluator that "he used to convince himself that since he didn't mean to kill Sherby or Mr. Carson, that the murders were an accident. However, in therapy he was made to realize it was no accident that the two people were murdered." In 2003, he told the evaluator that after he scuffled with the male victim and Sherby called out to him, he repeatedly hit the male victim "again and again, and again" until Powell hit the wall and stopped. The 2009 assessment references Powell's prior acknowledgement that he "struck both victims several times about the head and neck area with the bat killing them," and his acknowledgement that he " 'deliberately hit [Sherby] the second time."

Consistent with what he has acknowledged for many years, at his most recent parole hearing he stated: "When Mr. Carson jumped out of the bed and I held the bat out to him and told him not to move, that's when he hit the bat and knocked the bat, you know—pushed the bat out [of] the way, that's when Sherby got hit the first time. Then me and Mr. Carson, we got to struggling over the bat, you know, so as we was fighting, or trying to outdo one another by taking the bat, he's taking it from me and I'm keeping him from getting it from me, that's when him and I got to fighting and that's when I hit him once, and Sherby, that's when Sherby called my name and that's when I hit her, *intentionally* hit her." (Italics added.)

As the Board reviewed the crime with him, the presiding commissioner stated that Powell had changed his story because he previously had stated that he swung the bat "slightly." Powell correctly clarified that, as he had previously stated, at the beginning of the incident he swung the bat slightly, but that as he became enraged over the course of the incident he began to swing intentionally and with full force. The presiding commissioner pushed for details about how hard Powell hit the victims:

"PRESIDING COMMISSIONER DRUMMOND: How many times did you hit him?

"INMATE POWELL: I hit him, it couldn't have been no more than three times, and then—

"PRESIDING COMMISSIONER DRUMMOND: You had to hit him really hard.

"INMATE POWELL: I did, yes, I did. . . . [¶] . . . [¶]

"PRESIDING COMMISSIONER DRUMMOND: A homerun.

"INMATE POWELL: Yes, I did. [¶] . . . [¶]

"PRESIDING COMMISSIONER DRUMMOND: And then you hit her?

"INMATE POWELL: Yes, I did.

"PRESIDING COMMISSIONER DRUMMOND: You hit a homerun with her, too?

"INMATE POWELL: Yes. . . ."

At no point during his testimony before the Board, or in any of his psychological assessments for more than 20 years, has Powell suggested that the killings were accidental or denied that he lost his temper and swung the bat repeatedly, intending to hit both victims forcefully.

■ " '[L]ack of insight' is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness." (*In re Calderon, supra*, 184 Cal.App.4th at p. 690.) ■ Lack of insight is not demonstrably shown in this record. Neither does the record indicate that Powell has failed to accept responsibility for his actions or denies that he intentionally and forcefully struck both victims. The evidence is entirely and consistently to the contrary. Unlike the situation in *Shaputis*, there is no lack of insight or failure to accept responsibility that provides any evidence that Powell will present an unreasonable risk of danger if released on parole.

III. *The Board's Concerns About Powell's Parole Plans Are Not Sufficient to Support the Parole Denial Decision.*

The Board characterized Powell's parole plans as "well thought out" and we fully agree with this characterization. The Board suggested that Powell find a transitional housing program, such as the program sponsored by Veterans Affairs, for his initial placement. This recommendation is consistent with the psychologist's assessment that Powell may underestimate the transitional stresses he is likely to encounter when paroled. The Board was also concerned that he plans to attend Alcoholics Anonymous meetings far from where he plans to live and felt that he should have "a backup sobriety plan." The presiding commissioner's remarks appear to be more in the nature of helpful suggestions rather than reasons to consider Powell unsuitable for parole. In all events, we agree that none of these concerns provide any basis to conclude that Powell will pose an unreasonable risk to the safety of others if granted parole.

■ In making its decision concerning an inmate's eligibility for parole, the Board should consider whether "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) To qualify as "realistic" a plan need not be ironclad. (*In re Andrade* (2006) 141 Cal.App.4th 807, 817 [46 Cal.Rptr.3d 317].) Indeed, the regulation simply requires "realistic plans for release" *or* "marketable skills" and Powell meets that criterion, as evidenced by his vocational certificates in furniture upholstery, the mattress factory, and watch repair, as well as his work experience as the lead in the upholstery factory, as a clerk, and as a porter.

Nonetheless, the Board's desire to maximize the likelihood of a successful parole is appropriate. The Board may address that concern using its power to set reasonable parole conditions. (Pen. Code, §§ 3052–3053; *Terhune v. Superior Court* (1998) 65 Cal.App.4th 864, 874 [76 Cal.Rptr.2d 841].) It may condition Powell's parole on a suitable transitional placement or attending a substance abuse group closer to his future residence. Furthermore, after a life-term prisoner is given a parole date, a parole agent investigates the individual's plans confirming, inter alia, the inmate's proposed residence. (Dept. of Corrections and Rehabilitation, Operations Manual, *supra*, Adult Parole Operations, § 81010.5.1, pp. 668–669.) The agent determines whether a proposed program is suitable. If the plan is unsuitable, the parole agent must try to develop "an appropriate alternate program." (*Id.*, § 81.010.5, p. 668.) Thus, the Board may oversee Powell's parole plans and ensure that he is put into an appropriate placement without denying parole.

IV. *The Appropriate Disposition of This Matter Is to Remand the Case to the Board to Conduct a Prompt Rehearing Consistent with This Opinion.*

■ Powell urges us to remand this matter to the Board to set a parole-release date within 30 days of our order. As he acknowledges, however, we are bound by the Supreme Court's recent decision in *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541], holding that the remedy to which an inmate is entitled in these circumstances is to remand to the Board for reconsideration in light of our decision, without restriction on the Board's authority to review and evaluate the entire record. (*Id.* at p. 258 ["although a reviewing court may expressly limit the Board's reliance upon evidence the court already has considered and rejected as insufficient, the court should avoid issuing directives that improperly limit the Board's statutory authority to review and evaluate the *full* record—including evidence previously considered by the Board, as well as additional evidence not presented at prior parole hearings"].)

## DISPOSITION

The case is remanded to the Board to reconsider promptly its May 6, 2009 order denying parole in accordance with this decision.

Siggins, J., and Jenkins, J., concurred.