Filed 9/24/14  In re Brown CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re ANTHONY BROWN<br><br>on<br><br>Habeas Corpus. | D065504<br><br>(San Diego County<br>Super. Ct. No. HC 2006,<br>CR 142377) |

Petition for writ of habeas corpus.  Petition denied.

Law Office of Diane T. Letarte and Diane T. Letarte for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neil, Assistant Attorney General, Sara J. Romano and Brian C. Kinney, Deputy Attorneys General, for Respondent.

In 1994, petitioner Anthony Brown was sentenced to 15 years to life based on his conviction for second degree murder after he assaulted his then ex-girlfriend and current wife and caused the death of her unborn fetus.  Brown has since been incarcerated and has largely avoided any disciplinary action during incarceration.  At Brown's 2012 parole suitability hearing, the Board of Prison Hearings (BPH) concluded he was suitable for parole because there was no evidence supporting a conclusion he would pose an unreasonable risk of danger to society if released.  However, Governor Edmund G.

Brown, Jr., (the Governor) found Brown did pose an unreasonable risk of danger to society if released and therefore reversed the BPH's decision. Brown petitioned for writ of habeas corpus challenging the Governor's decision and we issued an order to show cause.

I

FACTS

A. <u>The Offense</u>

In 1993, Brown became enraged at his then ex-girlfriend, Mia, when he found evidence she had been talking on the phone with another man. When she tried to leave, he pushed her to the floor and began kicking her all over, including her abdomen, even though she was eight and one-half months pregnant. When Mia tried to reach for the phone, he snatched it away and kicked her again in the stomach and other parts of her body. During the attack, Brown cursed at her, stating "[t]his is what you get" and also exclaimed "[f]uck that baby. I don't care if you need to go to the bathroom. After I finish kicking your ass, you're going to be going to the bathroom on yourself." He eventually allowed her to leave, but the fetus died as a result of the attack.

B. <u>Brown's Criminal Background</u>

Prior to the offense in question, Brown had an extensive criminal history and his performance on probation and parole was unsatisfactory.

C. Brown's Performance in CYA and Prison

Brown was convicted in 1994.  In prison, he received three "CDC 128A's" and four "CDC 115's,"[1] the last occurring in 2005, none of which involved violence.  He has remained discipline free since 2005.  (Ex H, p. 4; Ex. A, pp. 84-85.)

The evidence showed, and the Governor did not question, that Brown's conduct while in prison had been good and showed a lengthy period of positive rehabilitation.  These included participation in numerous violence awareness and anger management classes between 1999 and 2012, which taught him how to control his anger through communication and to "walk away."  He has also participated in substance abuse groups since 2001.  The evidence also demonstrated, and again the Governor did not dispute, that Brown had viable parole plans, including family support systems, job offers, living arrangements, and relapse prevention programs.

D. Brown's Psychological Evaluations

The psychological evaluation prepared in conjunction with Brown's 2012 parole hearing (the Stotland Assessment), which served as an update to a 2009 Comprehensive Risk Assessment of Brown by Dr. Reed (the Reed Assessment), concluded he showed "generally fair insight."  However, after noting Brown "attributes his involvement in the commitment offense to becoming jealous," the Stotland Assessment cautioned Brown "*does not understand the underlying causes of his inappropriate jealous reaction and*

---

[1]     "[A] CDC 115 documents misconduct believed to be a violation of law which is not minor in nature.  A form 128 documents incidents of minor misconduct."  (*In re Gray* (2007) 151 Cal.App.4th 379, 389.)

3

*other antisocial behavior*" (italics added) and Brown "could benefit from assistance to better develop insight."

The Reed Assessment apparently reached a slightly different conclusion than the Stotland Assessment.  The Reed Assessment concluded Brown had accepted responsibility for the death of the fetus, was remorseful, and had "demonstrated good understanding of the causative factors underlying the commitment offense."  However, the Reed Assessment was apparently based in part on Brown's description of the offense to Dr. Reed that, although containing an admission of responsibility for the death of the fetus, minimized Brown's actions and shifted some responsibility to Mia.  Brown told Dr. Reed the events occurred because:

> " 'Mia was eight months pregnant . . . and emotions were running high because I had my [six-month old] son there.  [Mia] did not approve of me having a child by another woman.  So, emotions were running high.  [When Mia] sees my son [f]rom that point we argued . . . and then we started physically fighting.'  When asked what he did then, [Brown] said 'I slapped her on the side of the head and pushed her and she fell down on her butt.  She jumped on my back and I threw her off.  She fell on the bed and that is when she dove on me.  She jumped from the bed onto my back.  Then I threw her off me.'  When asked how did she fall, [Brown] said 'She fell on her stomach.'  [¶] . . .  He also said he 'never kicked or punched her with closed fist.' "

Brown also told Dr. Reed this was the one and only time they had physically fought, although there is some evidence in the record undermining this claim.[2]

---

[2]    The probation officer's report submitted in conjunction with Brown's original sentencing contained an interview with Brown's mother.  She told the probation officer she was in the house at the time of the attack and could hear (from another room) that Mia and Brown were on the bed "wrestling and tussling," and the mother said she "knows

The 2009 Reed Assessment concluded that, "[i]n light of all of the foregoing, his clinically estimated risk of violence within the community setting on parole is low as compared to US adult male offenders." However, a 2005 evaluator (the Castro Assessment) described Brown's risk of violence as "low to moderate," and expressed (among other concerns) that Brown "externalized responsibility for his actions."

## II

## HISTORY OF PROCEEDINGS

### A. The BPH Proceedings

*The 2009 Hearing*

At Brown's 2009 parole suitability hearing,[3] the BPH concluded Brown was not suitable for parole because of the nature of the commitment offense, Brown's unsatisfactory performance under prior grants of probation and parole, and his extensive and escalating prior criminal history. The BPH also concluded Brown's "past and present attitude toward the crime weighs heavily against [suitability because Brown] continues to minimize his involvement in the murder, [and] does not take full responsibility for his actions and in part blames others for this crime," noting Brown's version of the events was that he was fending off blows from Mia and she fell during the scuffle, and that he did not kick or hit Mia in the stomach. The BPH recognized the Reed Assessment was

---

the sound of the bed when the two are on it, wrestling around and fighting, because *this is not the first time they had an altercation with each other* in the bedroom." (Italics added.)

[3]    The People have moved to supplement the record with the transcript of Brown's 2009 hearing before the BPH. We grant the motion.

favorable, but the BPH expressed concern "about the [Reed Assessment] because it doesn't even speak to the [Castro Assessment] and . . . it's unfortunate [Dr. Reed] didn't go back because the [Castro Assessment] wasn't very positive, and [the Reed Assessment] doesn't really step up and give us some information as to why he moved in such a different direction."

*The 2012 Hearing*

At Brown's 2012 parole suitability hearing, the BPH concluded Brown was suitable for parole because, although "the record reflects some circumstances tending to show unsuitability for parole, which were considered by the Panel during deliberations, these are far outweighed by circumstances tending to show" suitability. Among the factors cited by the BPH for its determination was that Brown (1) had "a stable social history before incarceration but, more importantly, while incarcerated," (2) "has shown signs of remorse and accepted fully his responsibility for the actions [and] [h]is testimony here today and his discussion with clinicians were the evidence of that," and (3) the Reed Assessment "found him to be low overall [and] found no identifiable risk factors in the dynamic domain." Accordingly, the BPH granted Brown parole.

B. The Governor's Decision

The Governor, after reviewing the record, concluded Brown posed an unreasonable risk if released and reversed the BPH's grant of parole. The Governor specifically considered the "brutal and reprehensible" nature of the crime. The Governor, after comparing Brown's version of the events to the Governor's view of the events, also

6

stated Brown continues to whitewash "the extent of the violence he inflicted . . . [and] significantly minimizes his culpability in the death of his unborn son."

The Governor also stated Brown "has not sufficiently explained the reasons for his rage and violence." The Governor noted Brown told the BPH he beat Mia "because he was jealous and selfish," and agreed with the observations of the Stotland Assessment that Brown " 'does not understand the causes of his inappropriate jealous reaction and other antisocial behavior.' " The Governor noted that, "[c]onsistent with his deficient insight, [Brown] has not participated in any self-help programs on the subject of domestic violence" and observed Brown needed to "comprehensively explore what it was about his past or personality that allowed [him] to repeatedly beat and kick a very pregnant woman, so that he can constructively deal with issues that will arise in his future romantic relationships [and] [u]ntil he does so, I am not prepared to release him on parole."

III

LEGAL STANDARDS

A. The Parole Decision

The decision whether to grant parole is an inherently subjective determination (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*)) that should be guided by a number of factors, some objective, identified in Penal Code section 3041 and the BPH's regulations. (Cal. Code Regs., tit. 15, §§ 2281, 2402.) The Governor's decision to affirm, modify, or reverse the decision of the BPH rests on the same factors that guide the BPH's decision (Cal Const., art. V, § 8(b)), and is based on "materials provided by the parole authority." (Pen. Code, § 3041.2, subd. (a).) "Although these provisions

7

contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the [BPH's] decision." (*Rosenkrantz,* at pp. 660-661.)

In making the suitability determination, the BPH and Governor must consider "[a]ll relevant, reliable information" (Cal. Code Regs., tit. 15, § 2402, subd. (b); hereafter, reference to § 2402 refers to the regulations), including the nature of the commitment offense and behavior before, during, and after the crime; the prisoner's social history; mental state; criminal record; attitude toward the crime; and parole plans. (§ 2402, subd. (b).) The circumstances that tend to show *unsuitability* for parole include the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner[4]; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) A factor that alone might not establish unsuitability for parole may still contribute to a finding of unsuitability. (*Id.* at subd. (b).)

Circumstances tending to show *suitability* for parole include that the inmate: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable

---

4       Factors supporting the finding that the crime was committed "in an especially heinous, atrocious or cruel manner" (§ 2402, subd. (c)(1)), include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense.

social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress had built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law on release. (§ 2402, subd. (d).)

These criteria are "general guidelines," illustrative rather than exclusive, and "the importance attached to [any] circumstance [or combination of circumstances in a particular case] is left to the judgment of the Governor." (*Rosenkrantz, supra,* 29 Cal.4th at p. 679; § 2402, subds. (c), (d).) Thus, the endeavor is to try "to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz,* at p. 655.)

Because parole unsuitability factors need only be found by a preponderance of the evidence, the Governor is free to consider facts apart from those found true by a jury or judge beyond a reasonable doubt. (*Rosenkrantz, supra,* 29 Cal.4th at p. 679.) Indeed, the Governor's power to conduct a de novo review of the BPH's decision permits the Governor to "sit[] as the trier of fact and . . . draw reasonable inferences from the evidence" (*In re Smith* (2009) 171 Cal.App.4th 1631, 1639), and "to resolve conflicts in the evidence and to decide the weight to be given the evidence" (*In re Pugh* (2012) 205 Cal.App.4th 260, 265) unconstrained by the BPH's factual and credibility determinations. (Cf. *Rosenkrantz,* at p. 679 [Governor "not required by law to credit the same evidence

9

when exercising his constitutional authority in reviewing a parole decision of the [BPH]".) "Although 'the Governor's decision must be based upon the same factors that restrict the [BPH] in rendering its parole decision' [citation], [since] the Governor undertakes an independent, de novo review of the inmate's suitability for parole [citation], [he] has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety. [Citation.] '[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. . . .' " (*In re Lawrence* (2008) 44 Cal.4th 1181, 1204 (*Lawrence*).)

B. Standard for Judicial Review of Parole Decisions

In *Rosenkrantz,* the California Supreme Court addressed the standard the court must apply when reviewing parole decisions by the executive branch. The court first held that "the judicial branch is authorized to review the factual basis of a decision of the [BPH] denying parole . . . to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the [BPH] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.) *Rosenkrantz* further held that "courts properly can review a Governor's decisions whether to affirm, modify, or reverse parole decisions by the [BPH] to determine whether they comply with due process of law, and that such review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the [BPH]." (*Id.* at p. 667.)

10

The "some evidence" standard is "extremely deferential" and requires "[o]nly a modicum of evidence." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 679, 677.) A court may not vacate an administrative decision that is subject to the "some evidence" review simply because it disagrees with the assessment of the Governor. (*Ibid.*) The decision must be "devoid of a factual basis" to be overturned. (*Id.* at p. 658.) Because judicial review of a parole denial is to ensure that a decision is not arbitrary and capricious, thereby depriving the prisoner of due process of law, "the court may inquire only whether some evidence in the record before the [Governor] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658.)

In *Lawrence, supra,* 44 Cal.4th 1181, the Supreme Court noted its decisions in *Rosenkrantz* and *In re Dannenburg* (2005) 34 Cal.4th 1061, and specifically *Rosenkrantz's* characterization of "some evidence" as "extremely deferential" and requiring "[o]nly a modicum of evidence" (*Rosenkrantz, supra,* 29 Cal.4th at pp. 679, 677), had generated confusion and disagreement among the lower courts "regarding the precise contours of the 'some evidence' standard." (*Lawrence,* at p. 1206.) *Lawrence* explained that some courts interpreted *Rosenkrantz* as limiting the judiciary to reviewing whether "some evidence" exists to support an unsuitability factor cited by the BPH or Governor, and other courts interpreted *Rosenkrantz* as requiring the judiciary to instead review whether "some evidence" exists to support "the core determination required by the statute before parole can be denied—that an inmate's release will unreasonably endanger public safety." (*Lawrence,* at pp. 1207-1209.)

11

The *Lawrence* court, recognizing the legislative scheme contemplates "an assessment of an inmate's *current* dangerousness" (*Lawrence, supra,* 44 Cal.4th at p. 1205), resolved the conflict among the lower courts by clarifying that the analysis required when reviewing a decision relating to a prisoner's current suitability for parole is "whether some evidence supports the *decision* of the [BPH] or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings."  (*Id.* at p. 1212.)  *Lawrence* clarified that the standard for judicial review, although "unquestionably deferential, [is] certainly . . . not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors *with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the* determination of current dangerousness."  (*Lawrence,* at p. 1210, italics added.)  Indeed, it is *Lawrence's* numerous iterations (and variants) of the requirement of a "rational nexus" between the *facts* underlying the unsuitability factor and the *conclusion* of current dangerousness that appear to form the crux of, and provide the teeth for, the standards adopted in *Lawrence* to clarify and illuminate "the precise contours of the 'some evidence' standard."  (*Id.* at p. 1206.)

After clarifying the applicable standard of review, *Lawrence* addressed how one "unsuitability" factor—whether the prisoner's commitment offense was done in a particularly heinous, atrocious, or cruel manner—can affect the parole suitability determination, and whether the existence of some evidence supporting the BPH's finding that the offense was particularly heinous, atrocious, or done in a cruel manner is alone

12

sufficient to deny parole. *Lawrence* concluded that when there has been a lengthy passage of time, the Governor may continue to rely on the nature of the commitment offense as a basis to deny parole only when *other* facts in the record, including the prisoner's current demeanor and mental state, provide a rational nexus for concluding an offense of ancient vintage continues to be predictive of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at pp. 1211, 1214, 1221.)

Thus, the "extremely deferential" standard, although vesting in the Governor the power to resolve evidentiary conflicts and assign the weight to be given to the evidence (*Rosenkrantz, supra,* 29 Cal.4th at p. 679), is not the equivalent of judicial abdication, because the court must be satisfied the evidence substantiates the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. (*In re Lee* (2006) 143 Cal.App.4th 1400, 1408.) It violates a prisoner's right to due process when the Governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. (See, e.g., *In re DeLuna* (2005) 126 Cal.App.4th 585, 597 [BPH concluded, contrary to psychological evaluations, that inmate needed therapy, and faulted inmate facing deportation for failing to learn English]; *In re Scott* (2005) 133 Cal.App.4th 573, 597-603) [Governor misconceived inmate's history of violent crime and nature of the commitment offense]; *In re Lee,* at pp. 1411-1414 [Governor overstated seriousness of commitment offense and improperly faulted inmate for late acceptance of responsibility].)

IV

ANALYSIS

A. Analysis of Merits

The Governor's decision here did not dispute that the evidence on most of the relevant suitability factors,[5] as well as the evidence on most of the unsuitability factors, militated in favor of finding Brown suitable for parole. In this evidentiary context, we must examine whether, notwithstanding the numerous factors supporting parole, there is some evidence that Brown's current mental attitude provides a rational nexus for concluding the circumstances of the crime continue to be predictive of current dangerousness.

The Governor found that, notwithstanding the evidence (from both Brown and the Reed Assessment) Brown expressed remorse and accepted responsibility, Brown nevertheless was an unreasonable risk if released on parole because he "fail[s] to come to grips with the severity and callousness of his actions" and "whitewashes the extent of the violence he inflicted," and continues to proffer a version of events that minimized his own culpability while suggesting some fault was attributable to Mia. The Governor also found Brown had not shown a sufficient understanding about, or insight into, why his jealousy would cause him to react with such extreme violence toward a particularly vulnerable woman. Because the Governor's conclusion of Brown's current dangerousness

---

[5] Brown has a family support system, has shown signs of remorse, made realistic plans for release, engaged in institutional activities that indicate an enhanced ability to function within the law on release, and does not possess a prior record of violent crime. (§ 2402, subd. (d).)

14

appears exclusively to have been based on his findings that, as of the 2012 hearing, Brown had not yet accepted full responsibility for his conduct or attained adequate insight into his criminal conduct, we must examine these factors,[6] determine whether there is any evidentiary support for these findings, and assess whether those deficiencies could rationally be indicative of Brown's current dangerousness.

In *In re Powell* (2010) 188 Cal.App.4th 1530, the court recognized that although "insight is not listed among the criteria the BPH is to consider in determining whether an inmate is suitable for parole [citations], since the decision in [*Shaputis I*], the [BPH] has routinely invoked lack of insight to justify a finding of unsuitability. [Citation.] [*Shaputis I*] articulates the principle that the [BPH] may rely on static factors to support an unsuitability finding only if there is a rational basis for concluding ' "that an inmate *continues* to pose an unreasonable risk to public safety." ' [Quoting *Shaputis I, supra*, 44 Cal.4th at p. 1255.] In that case, the inmate's history of domestic violence (an immutable characteristic) was regarded as a valid indicator of current dangerousness in part because of his inability 'to gain insight into his antisocial behavior.' (*Id*. at p. 1260.) There was objective evidence in that case that fully supported such a finding." (*In re Powell,* at

---

6      Although both *Lawrence* and *In re Shaputis* (2008) 44 Cal.4th 1241, 1260 (*Shaputis I*) approved consideration of the prisoner's failure adequately to express remorse for or "insight" into his or her conduct as a basis for concluding the prisoner is unsuitable for parole, at least one court has expressed discomfort with an approach that indirectly requires the prisoner to admit guilt even though the statute and applicable regulations (see Pen. Code, § 5011, subd. (b); Cal Code Regs., tit. 15, § 2236) preclude the Governor from conditioning a prisoner's parole on an admission of guilt. (See *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110-1111, disapproved on other grounds in *In re Prather* (2010) 50 Cal.4th 238, 252-253; accord, *In re Juarez* (2010) 182 Cal.App.4th 1316, 1340-1342.)

pp. 1539-1540.) Powell recognized that, like all evidence relied on to find an inmate unsuitable for release on parole, " ' "[l]ack of insight" is probative of unsuitability only to the extent that it is both (1) demonstrably shown by the record and (2) rationally indicative of the inmate's current dangerousness.' " (*Id*. at p. 1542.)

We must therefore examine whether the record demonstrably shows there was a "modicum of evidence" from which the Governor could have concluded Brown "significantly minimizes his culpability" for the death of the fetus, and lacked adequate insight into or understanding about why his jealousy triggered a reaction involving such extreme violence toward a very pregnant woman. If there is some evidence supporting those determinations, we must also evaluate whether (considering Brown's commitment offense and background) those facts may be rationally indicative of the inmate's current dangerousness.

We begin by noting the Governor concluded Brown was unsuitable for parole because the circumstances of Brown's commitment offense, when coupled with his failure to fully accept responsibility and his insufficient insight into why he committed such a vicious attack, made Brown an unreasonable risk of danger were he released on parole. The Governor's first conclusion—that Brown committed the offense in a particularly brutal and reprehensible manner—has a modicum of evidentiary support: the evidence that Brown repeatedly kicked a very pregnant woman in the abdomen as retribution for her perceived infidelity, expressing conscious disregard for the consequences to her innocent fetus, supports that finding. However, as *Lawrence* teaches, when (as here) there has been a lengthy passage of time, the Governor may

16

continue to rely on the nature of the commitment offense as a basis to deny parole only when there are *other* facts in the record, such as the prisoner's current demeanor and mental state, that provide a rational nexus for concluding an offense of ancient vintage continues to be predictive of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at pp. 1211, 1214, 1221.)

In this case, the evidence of "current demeanor and mental state" cited by the Governor were the Governor's conclusions that (1) Brown had not accepted full responsibility for his actions because he "whitewashes" his conduct and (2) Brown had not dealt with the reasons he viciously assaulted Mia because he lacked a sufficient understanding about, or insight into, why his jealousy would cause him to react with such extreme violence toward a particularly vulnerable woman. We must examine these concerns to determine whether the findings are "demonstrably shown by the record" as well as "rationally indicative of the inmate's current dangerousness." (*In re Powell, supra,* 188 Cal.App.4th at p. 1542.)

There is some evidence Brown has not accepted full responsibility for his actions because there is some evidence he minimizes both his conduct and his responsibility. In his statements to the clinicians, reflected in both the 2005 Castro Assessment and the 2009 Reed Assessment, Brown denied repeatedly striking and kicking Mia, and claimed Mia was the instigator of both the argument (because of her jealousy toward his having a son with another woman) and of the physical altercation, and that she fell when as he tried to ward her off in reaction to her assault. Similarly, in his testimony before the BPH in 2009, he stated he pushed and slapped Mia when she grabbed him but denied punching

17

or kicking her. In his testimony before the BPH in 2012, his narrative description of the offense stated that Mia "threw something at me," an argument ensued, and he slapped her on the side of the head, pushed her down and kicked her, and walked out of the bedroom. This cursory description failed to acknowledge the extent to which he repeatedly directed his punches and kicks at Mia's belly, and a later colloquy provides additional evidence Brown apparently has continuing difficulty acknowledging the extent of his attack on Mia,[7] which provides a modicum of evidence to support the Governor's factual determination that Brown continues to minimize both his conduct and his responsibility. (*In re Shaputis* (2011) 53 Cal.4th 192, 212 ["[u]nder the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary"] (*Shaputis II*).) Although Brown asserts the Governor's conclusions regarding minimization are based on a selective reading of

---

[7]     At the 2012 BPH hearing, a BPH commissioner asked Brown for his answer to the Stotland Assessment's observation that Brown attributed his involvement in the commitment offense to becoming jealous but " 'does not understand the underlying causes of his inappropriate jealous reaction and other antisocial behavior.' " Brown responded he got "jealous to the point where someone got--where my child got killed." However, the BPH commissioner clarified that the question was *why* Brown experienced a jealousy reaction so intense that it would allow Brown to engage in such a vicious assault. Brown responded "when we was pushing back and forth, I didn't know that I killed . . . my child . . . until later on. But I still shouldn't have got into that type of--." The BPH commissioner then chided Brown that "it's more than pushing. It's about kicking and . . . [¶] . . . [¶] . . . hitting . . . . [¶] . . . [¶] Because pushing didn't cause that. The kicking and hitting did. You and I know that." Brown responded only that, "It's never, under no circumstances, okay to hit a pregnant woman, punch, kick, push or engage in any of that." The BPH commissioner then replied, "All right. But you're not answering what [are] the underlying causes for you to allow to rise to that," and Brown's response was "I was hurt . . . my emotions got the best of me and I just couldn't control my emotions."

18

the record, and ignore other passages showing Brown does accept responsibility for his actions, "comments . . . may be regarded as downplaying and not fully confronting the gravity of the criminal misconduct . . . and [e]ven if this court might not have drawn that inference, we cannot say that it was irrational." (*In re Stevenson* (2013) 213 Cal.App.4th 841, 869.)

There is also some evidence supporting the Governor's conclusion Brown did not have a sufficient understanding about, or insight into, why his jealousy and selfishness would cause him to react with such extreme violence toward a particularly vulnerable woman when "[m]any [people] are jealous and selfish, but do not abuse women." The Stotland Assessment, while characterizing Brown's insight as "generally fair," specifically cautioned that he "does not understand the underlying cause of his inappropriate jealous reaction and other antisocial behavior" and concluded Brown "could benefit from assistance to better develop insight." When specifically asked to respond to why he believed he reacted so violently to Mia's perceived infidelity, Brown's only response was that he was "hurt [and] my emotions got the best of me and I just couldn't control my emotions." (See fn. 7, *ante*.) The Governor could rationally conclude the Stotland Assessment correctly recognized Brown lacks an adequate understanding of or insight into his violent behavior (*In re Mims* (2012) 203 Cal.App.4th 478, 491 [the deferential standard of review precludes this court from "reweighing the evidence, reconsidering the credibility of the expert opinions considered by the [BPH], and substituting its own judgment" for the Governor's evaluation of the experts' opinions]) and the Governor could rationally conclude the fact Brown recognized *that* he

19

lost control of his emotions is not commensurate with an adequate understanding of the root causes for why extreme violence is Brown's *response* to a loss of control.[8]

Because we conclude there is a modicum of evidence for the Governor's factual determinations, we are left with the question of whether (considering Brown's commitment offense and background) such facts may be rationally indicative of the inmate's current dangerousness. *Shaputis II* states our Supreme Court has "expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II, supra,* 53 Cal.4th at p. 218.) Similarly, the courts have repeatedly observed that an inmate's minimization of the gravity of the criminal misconduct that he or she carried out can be a " 'significant predictor[] of an inmate's future behavior should parole be granted.' " (*In re Stevenson, supra,* 213 Cal.App.4th at p. 869; accord, *In re Tapia* (2012) 207 Cal.App.4th 1104, 1112 ["An inmate's downplaying or minimizing aspects of the commitment offense reflects a

_____

8       Brown argues the Governor improperly credited the Stotland Assessment and ignored the Reed Assessment (to which the Stotland Assessment was merely a supplement), which found Brown did have a "good understanding of the causative factors underlying the commitment offense." First, the determination of which evaluation was more credible is vested in the Governor, and the more recent assessment could rationally be viewed as more credible, particularly considering Brown's apparent struggle to articulate why he reacted with extreme violence. Moreover, the Governor could rationally have viewed the Reed Assessment with skepticism, both because (as observed by the 2009 BPH panel) the Reed Assessment contained no reference to an earlier assessment that was *not* positive (and hence did not explain why it reached a different conclusion), and because the Reed Assessment may have been founded on a description of the commitment offense by Brown that *falsely portrayed the actual violence* he inflicted.

20

denial of responsibility, and is probative of current dangerousness."].)  We conclude the requisite rational nexus exists between the Governor's factual determinations and his ultimate conclusion that Brown currently poses an unreasonable risk of danger if released from prison, and we therefore affirm the Governor's decision reversing the BPH and denying Brown parole.

DISPOSITION

The order to show cause is dismissed and the petition for writ of habeas corpus is denied.

McDONALD, J.

WE CONCUR:

HALLER, Acting P. J.

AARON, J.