[No. E051622. Fourth Dist., Div. Two. Feb. 9, 2012.]

In re ANDREA MIMS on Habeas Corpus.

**COUNSEL**

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Julie L. Garland, Phillip Lindsay and Amy M. Roebuck, Deputy Attorneys General, for Appellant The People.

Nixon Peabody, Paul R. Lynd, Krista P. Bell and Stephanie A. Karnavas for Defendant Andrea Mims.

**OPINION**

**RAMIREZ, P. J.**—Andrea Mims, the defendant, filed a petition for writ of habeas corpus to seek review of the decision by the Board of Parole Hearings (the Board) to deny her release on parole. Defendant was serving a sentence of 26 years to life following her conviction for murdering her fifth husband. The Board's decision, which credited defendant for her exemplary behavior

in prison, was based on the determination that defendant lacked insight into the causative factors relating to the crime, her unstable social history, and the heinous nature of the offense. The Board decided that she posed an unreasonable risk of danger until she could confront her motivations and admit them. The superior court granted defendant's petition and the People appeal.

On appeal, the People argue that the Board's decision was properly supported by some evidence and that the superior court improperly reweighed the evidence in granting defendant's petition. We reverse.

## BACKGROUND[1]

a.  *Facts Regarding the Commitment Offense.*

On May 14, 1981, defendant killed Robert Sand, her fifth husband, at their home in Rancho Mirage. The victim had been stabbed and struck in the head with a blunt instrument. Defendant informed law enforcement officials who investigated the homicide that her wheelchair-bound husband was killed by intruders. Subsequently, defendant informed investigators that after praying, she recalled more information, and related that she had removed the knife from her husband's body, washed it, and hid it in the living room; she found a board in the bedroom covered with blood and washed it, as well.

In another statement, defendant reported taking two sleeping pills and some muscle relaxant medication on the evening of the crime, and retiring to a guest room. She was awakened by the victim's cry for help, and went to his bedroom, where she observed him lying on the floor next to the bed. In this version, she described going to his aid only to find that he was faking injury; he grabbed her and paddled her with a board, demanding that she participate in a sexual fantasy, but she refused. She grabbed the board from the victim, and the victim grabbed a knife, threatening to kill defendant. She grabbed the knife from the victim and stabbed him numerous times.

In postarrest interviews, defendant related a history of sexual mistreatment by the victim, to whom she was married for five months, as the reason for killing her husband.

b.  *Procedural History.*

Defendant was arrested in March 1982, and charged with murder (Pen. Code, § 187), with a knife-use allegation. (Pen. Code, § 12022, subd. (b).)

---

[1] We take judicial notice of our opinion in *People v. Sand-Mims* (Oct. 8, 1986, E001014) (nonpub. opn.). The decision was incorporated by reference along with other documents at defendant's most recent parole hearing.

Defendant pled not guilty and not guilty by reason of insanity. Following a jury trial, defendant was found guilty of first degree murder and the weapon-use allegation was found to be true. Defendant was also found to be sane. She was sentenced to state prison for the aggregate term of 26 years to life for the substantive crime and the enhancement.

Defendant was received by the Department of Corrections ·(now the Department of Corrections and Rehabilitation) on May 10, 1984. Defendant's minimum eligible parole date was August 22, 1998. On July 29, 2009, the Board conducted a subsequent parole suitability hearing. Along with numerous letters of support and certificates of completion of various educational and self-help programs, the Board considered the psychological evaluations of Stephen Pointkowski, Ph.D., and Linda S. Barnard, Ph.D. Dr. Barnard concluded defendant presented little or no risk if released on parole. Dr. Barnard diagnosed defendant as suffering from posttraumatic stress disorder (PTSD) related to defendant's reports of multiple rapes and domestic violence. Dr. Barnard assessed defendant's risk as minimal, based on defendant's behavior in prison, the fact that defendant had taken full responsibility for her actions, and had worked hard to learn all she could about how she became vulnerable to her situation.

Dr. Pointkowski agreed that defendant conceivably satisfied threshold criteria for a diagnosis of PTSD at an earlier point in her life, but recognized the possibility that defendant might have attempted to depict herself as suffering from PTSD in an attempt to mitigate responsibility for her offense. Dr. Pointkowski noted that defendant presented no symptoms of PTSD, including no anxiety symptoms, when she was assessed. Dr. Pointkowski assessed defendant's risk of violence to be in the low-to-moderate range.

However, Dr. Pointkowski concluded defendant's continued efforts to rationalize and mitigate culpability for her commitment offense indicated a lack of insight into the factors that led to the crime. In this regard, Dr. Pointkowski noted that defendant's alleged vague recollection of struggling for her life with the victim, her purported response to the victim's scream and finding him dead, and then supposedly blacking out, were collectively suggestive of questionable honesty, rationalization, and/or efforts to mitigate culpability. He stated, "While she overtly blamed herself for the instant offense, this was viewed as superficial. Accordingly, she cannot be seen as possessing adequate insight into the underlying causal factors."[2]

---

[2] Dr. Barnard's updated report took issue with many of Dr. Pointkowski's statements, asserting that there were several factual errors in his report, resulting from misinformation appearing in previous reports that had never been corrected and was carried on in future reports. However, it appears that any factual misinformation was provided by defendant herself. For instance, Dr. Barnard criticized Dr. Pointkowski's reference to the incorrect fact

The Board denied parole for three years, finding defendant unsuitable for release. The Board's decision was based on (1) defendant's past and present mental state and past and present attitude toward the crime; (2) lack of insight into causative factors; and (3) the commitment offense, which was especially cruel. The Board also pointed to defendant's history of unstable relationships with six previous marriages and abusive behavior in those relationships.

Defendant filed a petition for writ of habeas corpus on December 7, 2009. On July 8, 2010, the superior court granted the petition. On August 16, 2010, the People appealed.

### c. *Facts of the Commitment Offense.*

Robert Sand, the victim, was 69 at the time of his murder, and was confined to a wheelchair. At the time of his death, he and defendant had been married for five months. Sand became acquainted with defendant, a career

---

that defendant's parents were not married, but did not acknowledge that it was defendant who reported this misinformation to Dr. Pointkowski. Dr. Barnard also asserted that the rape at age 15 was not the result of being set up on a date but instead resulted when defendant's sister arranged for defendant's first husband to pick her up from basketball practice. However, it was defendant who reported to Dr. Pointkowski that she had been set up on a date which resulted in the rape and pregnancy. Interestingly, defendant's mother reported that defendant went on a date with her first husband, that he got her drunk and took advantage of her, resulting in defendant's pregnancy with her first child. So defendant's personal history has not been consistently reported by defendant herself.

Dr. Barnard also stated emphatically that defendant did not have a substance abuse problem. In this vein, at her 2008 parole hearing, defendant testified that she was a very light social drinker because she did not like getting high. However, in her interview with the probation officer following her conviction, defendant reported being a moderate consumer of alcoholic beverages (approximately three or four drinks daily), sporadic use of marijuana from the time she was in her late 20's (defendant was born in 1941 so she commenced her marijuana use sometime in the 1960's) until 1980, regular use of barbiturates as well as morphine-based pain medication following a back injury in 1968, and occasional use of cocaine while working as a call girl over a nine-year period. Defendant also informed the probation officer that she developed "fairly serious drinking problems" following an accident in 1968. Dr. Barnard made a point of noting that no sign of drugs or alcohol were found in defendant's system "[a]t the time of her commitment offense." However, the probation report, which refers to the fact defendant was transported to a medical center for testing approximately eight hours after the crime, does not indicate what the results of the drug tests were. Additionally, it was defendant who reported that on the evening before the murder she ingested two sleeping pills and an undisclosed amount of muscle relaxant. When she was interviewed by Dr. Pointkowski, she claimed she took only one sleeping pill. Dr. Barnard does not indicate the source of her information that defendant's drug tests at the time of the crime showed negative results and we cannot find any information in the record to support the statement that the tests were negative. In fact, in the direct appeal, one of the issues presented was that the trial court committed prejudicial error in failing to instruct, sua sponte, on the effect of unconsciousness due to voluntary intoxication. In short, any discrepant information in Dr. Pointkowski's report was directly attributable to defendant.

call girl, in 1979.[3] They married in late 1980. Problems in the marriage became apparent quickly and Sand contemplated divorcing defendant. He complained to his attorney that defendant had a terrible temper, insulted him, and that she played tennis often, making him feel abandoned.

Defendant also complained about the marriage, claiming she was not allowed to go out or have her own friends. She also mentioned to family members they should not be surprised if something happened to her and alerted them to Sand's sexual fantasies and perversions. On one occasion, defendant contacted an acquaintance and asked him about the effects of Seconal and whether he had ever killed anyone. She told the acquaintance she had already tried to poison her husband, and three weeks before the murder she told a tennis friend that Sand would soon die from multiple sclerosis. When informed that multiple sclerosis would not kill her husband although he would be confined to a wheelchair, defendant responded, " ' "No. He knows he's going to die very soon." ' "

On May 14, 1981, Sand was found dead with multiple stab wounds and head wounds caused by a wooden board. He had sustained 51 wounds, including four stab wounds to the heart cavity that were the cause of death. The marriage had lasted only five months. Defendant initially claimed that an intruder had killed her husband. Later, defendant stated she found her husband stabbed and beaten and that he had died with his head in her lap. Later she admitted washing blood off herself, changing her clothes, cleaning the room, pulling the knife from the victim and washing the blood from the knife and the wooden board. One month after the murder, defendant told a friend that she "had stabbed the old bastard." Defendant was arrested 10 months after the murder.

After her arrest, defendant claimed that Sand held her captive and engaged her in a series of "sex games" which became progressively more demanding, intense, and physically dangerous. In this account, defendant related that on the night of the offense, the victim demanded that she perform another sex game, but she refused. She retired to the guest bedroom and claimed to have ingested two sleeping pills and some muscle relaxant medication. She awoke hearing Sand crying for help and proceeded to his bedroom where she found him lying on the floor next to the bed, so she went to his aid, only to find he was faking an injury. Defendant claimed that he immediately grabbed her and began paddling her with the wooden board, which she was able to take away. Sand then grabbed a knife and threatened to kill her, so she struck him with

---

[3] At the subsequent parole hearing conducted in 2009, the Board incorporated by reference our opinion in the direct appeal, *People v. Sand-Mims, supra*, E001014, of which we have taken judicial notice. The text of the background contained in that opinion was recited at the parole hearing conducted in 2008.

the board, eventually knocking the knife from his hand, and then she grabbed the knife and stabbed Sand numerous times.

### d. *Additional Precommitment Facts.*

The Board's decision rested in part on defendant's unstable relationship history, so a review of her personal history is relevant. However, defendant's reports of her personal history are as varied as her statements about the circumstances of the crime, making it difficult to parse out fact from fiction. For this reason, we recite only the facts about defendant's personal history that are independently corroborated by material in the record. For the background facts relating to the underlying crime, we refer to our decision in defendant's direct appeal, *People v. Sand-Mims, supra*, E001014, which was read into the record of the fifth parole hearing, and incorporated by reference into the record of the sixth parole hearing.

At age 15, defendant married her first husband after becoming pregnant. According to defendant, she was raped; according to a declaration attributed to defendant's mother, the man who would become defendant's first husband got her drunk and "took advantage" of her. Nevertheless, the two-and-a-half year marriage was an abusive one, and ended in divorce in 1960. Defendant had two children during this marriage.

Between the ages of 18 and 26, defendant had various jobs, but never held a job for very long. She claimed to have worked as a secretary, waitress, escrow worker, actress, touring exotic dancer, and a model. Her longest employment was the approximately nine years she worked as a call girl. She had four additional marriages (some lasted only days) before she met Robert Sand, who would become her fifth husband, and who was one of her clients. After five months of marriage, defendant murdered Sand, but was not arrested until months later, because defendant reported he had been stabbed by intruders.

Approximately nine months after the murder, defendant met and married Joe Mims, to whom she was married for seven months. On November 1, 1982, while on bail for the murder of Sand, defendant assaulted Mims by striking him on the head with a hammer. That marriage was annulled after defendant was charged with Sand's murder and after defendant assaulted Mims by hammering him on the head.

Defendant was evaluated by numerous psychologists in connection with her criminal trial, who provided different diagnoses, including schizophrenia, atypical depression with features of paranoid schizophrenia, borderline personality disorder, and histrionic personality disorder.

## DISCUSSION

a. *Standard of Review.*

Judicial review is available to review decisions rendered by the Board (or the Governor) denying parole (or reversing a grant of parole). (*In re Lawrence* (2008) 44 Cal.4th 1181, 1203 [82 Cal.Rptr.3d 169, 190 P.3d 535]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664 [128 Cal.Rptr.2d 104, 59 P.3d 174].) The standard of review applied by a superior court in evaluating a parole-suitability determination is whether some evidence supports the core statutory determination that a prisoner remains a current threat to public safety. (*In re Lawrence*, at pp. 1191, 1210; *In re Shaputis* (2008) 44 Cal.4th 1241, 1254 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis I*); *In re Rosenkrantz*, at p. 677.) The superior court's review of a decision to deny parole by the Board is deferential. (*In re Lawrence*, at pp. 1204, 1210; *Shaputis I*, at pp. 1254–1255.)

Under the "some evidence" standard, only a modicum of evidence is required to uphold a decision regarding suitability for parole. (*In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*); *In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.) It is not for the reviewing court to decide *which* evidence in the record is convincing. (*Shaputis II*, at p. 211.) While the standard is not "toothless" and " 'must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights' [citation], it must not operate so as to 'impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch' [citation]." (*Id.* at p. 215.) Thus, when the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary. (*Ibid.*)

When a superior court grants relief on a petition for habeas corpus without an evidentiary hearing, the question presented on appeal is a question of law, which we review de novo. (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1192 [92 Cal.Rptr.3d 36].)

b. *Analysis.*

■ The Board is the administrative agency within the executive branch authorized to grant parole and set release dates. (*In re Prather* (2010) 50 Cal.4th 238, 249 [112 Cal.Rptr.3d 291, 234 P.3d 541].) The power to grant or deny parole is statutory and committed exclusively to the judgment and discretion of the Board. (*Id.* at p. 250, citing *In re Fain* (1983) 145 Cal.App.3d 540, 548–550 [193 Cal.Rptr. 483].) Penal Code section 3041, and title 15, section 2402 of the California Code of Regulations govern the Board's parole

decisions. Penal Code section 3041, subdivision (b), requires the panel or the Board, sitting en banc, to set a release date unless it determines that the gravity of the current convicted offense or offenses is such that consideration of the public safety requires a more lengthy period of incarceration for the individual.

Title 15 of the California Code of Regulations, section 2402, lists factors to be considered by the Board in determining an inmate's suitability for release on parole. "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) The panel may consider all relevant, reliable information available. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) Among other circumstances tending to show unsuitability, the panel may consider (a) that the prisoner committed the offense in an especially heinous, atrocious or cruel manner; (b) unstable social history; and (c) psychological factors. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1), (3), (5).) Thus, in determining whether a prisoner is suitable for parole, the fundamental consideration is public safety. (*In re Masoner* (2009) 179 Cal.App.4th 1531, 1536 [102 Cal.Rptr.3d 463].) The Board's discretion in parole matters has been described as "great" and "almost unlimited." (*In re Lawrence, supra*, 44 Cal.4th at p. 1204.)

Where defendant has decided to limit the evidence available to the Board by refusing to participate in an evaluation by a Department of Corrections and Rehabilitation psychologist and declining to speak to the Board on any matter of substance at the parole hearing, the evidence of past dangerousness does not "evaporate," and the Board may rely on other information available, including prior psychological evaluations. (*Shaputis II, supra*, 53 Cal.4th at p. 211.)

i. *Lack of Insight.*

In overturning the Board's decision, the superior court first focused on the factor of lack of insight, one of the factors cited by the Board. "Lack of insight" is not listed among the criteria the Board is to consider in determining an inmate's suitability for parole (see Cal. Code Regs., tit. 15, §§ 2281, 2402), but has been routinely invoked based on the principle that the Board may rely on static factors to support an unsuitability finding if there is a rational basis for concluding that the inmate continues to pose an unreasonable risk to public safety. (*In re Powell* (2010) 188 Cal.App.4th 1530, 1539–1540 [116 Cal.Rptr.3d 432].)

"[C]hanges in a prisoner's maturity, understanding, and mental state" are "highly probative . . . of current dangerousness." (*In re Lawrence, supra*, 44

Cal.4th at p. 1220; see *Shaputis I, supra,* 44 Cal.4th at p. 1260.) The court in *Powell* determined that the Board's finding of lack of insight and acceptance of responsibility was based on a misconstruction of the inmate's statements explaining the crime. (*In re Powell, supra,* 188 Cal.App.4th at p. 1540.) The present case is distinguishable from *Powell* and similar to *Shaputis I* and *Shaputis II.*

The superior court found there was no evidence to support the "lack of insight finding," disagreeing with the Board's reference to Dr. Pointkowski's report, stating, "The record is clear that this particular inmate was a severely physical [*sic*] and psychological [*sic*] abused individual. It is also clear that this abuse was a major causative factor in the murder committed by the inmate." Unfortunately, this was *not* clear from the record, although it was clearly defendant's stated rationalization for her participation in the crime. There is independent evidence to support a conclusion that defendant was abused by her first husband, based on defendant's mother's declaration that she observed the abuse. However, aside from defendant's self-serving statements, there is nothing in the record to support a finding that defendant was suffering from PTSD at the time of the commitment offense. In reaching its conclusion that the Board erred in failing to recognize that abuse was a major causative factor in the murder, the superior court engaged in reweighing the evidence. This was improper. (*In re Prather, supra,* 50 Cal.4th at pp. 253–254.)

To the contrary, there was "some evidence" to support the Board's determination that defendant lacked insight into the motivation for the crime. The Board could properly interpret defendant's reports of rapes and physical abuse as an evolving effort to mitigate her own culpability, reinventing the circumstances of the crime over time, as well as her personal history.

### ii.  *The Egregious Nature of the Commitment Offense.*

The trial court also determined there was not "some evidence" to support the Board's reference to the egregious nature of the commitment offense. The court stated that the "aggravated nature of the murder shall not be used to negate suitability unless they [*sic*] are probative to the central issue of current dangerousness," citing *In re Lawrence, supra,* 44 Cal.4th at page 1212. The court went on to state the Board "must clearly show the facts and circumstances of the murder support the ultimate conclusion that this inmate continues to pose an unreasonable risk to public safety," but concludes that the transcript of the proceedings is devoid of any such connection because there is no analysis of how the facts of the offense demonstrate current dangerousness: "There is no analysis of these facts in light of the passage of

time and/or the attendant changes in the inmate's psychological or mental attitude . . . ." Again, the superior court reweighed the evidence in reaching this conclusion.

■ When the Board bases unsuitability on the circumstances of the commitment offense, it must cite some evidence of aggravating facts beyond the minimum elements of the offense. (*In re Rozzo* (2009) 172 Cal.App.4th 40, 53 [91 Cal.Rptr.3d 85].) In order to prevent the Board's case-by-case suitability determinations from swallowing the rule that parole should normally be granted, an offense must be particularly egregious to justify denial of parole. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1095 [23 Cal.Rptr.3d 417, 104 P.3d 783].) ■ Here, the Board cited the exceptionally callous disregard for human suffering manifested by the nature of the crime, which involved beating, stabbing repeatedly, and mutilating the victim. Considering the fact the victim apparently suffered from multiple sclerosis and was confined to a wheelchair, there is "some evidence" to support the conclusion that the offense was particularly egregious.

Regarding defendant's mental state in light of the passage of time and any attendant changes in defendant's psychological or mental attitude, there is an abundance of evidence to support the Board's decision. First, the Board was stymied in its attempt to evaluate defendant's current mental attitude toward the crime by defendant's invocation of her right not to speak to the panel, precluding the Board from determining any changes in her psychological or mental attitude towards the crime. In the sexually violent predator (SVP) context, we have held that a defendant who refuses to be interviewed by the state's experts cannot challenge a finding that he or she currently has a psychological disorder. (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 353–354 [27 Cal.Rptr.3d 233].) While an inmate in a parole hearing has the right to decline to be questioned at the hearing, just as the SVP committee has the right to refuse to be interviewed by experts, defendant forfeited the claim that the Board failed to consider any changes to her psychological or mental attitude toward the crime.

Second, defendant has not participated in any mental health counseling or treatment during her lengthy incarceration, despite the great weight of evidence that she suffers from several possible psychological disorders to which she attributed the commission of the crime and for which she was apparently hospitalized at one point. In this regard, there is overwhelming evidence to support Dr. Pointkowski's opinion that defendant has not addressed the causal factors of the crime, which the Board cited in its decision. Participation in battered women's programs and other self-help and educational programs cannot be viewed as an effective substitute for the treatment of psychological disorders, however helpful they may be.

Third, the Board noted Dr. Pointkowski's conclusion that defendant's vague recollection of the circumstances surrounding the commission of her commitment offense was suggestive of questionable honesty, rationalization, and efforts to mitigate her culpability. Defendant's questionable honesty is further reflected in the many instances of misinformation about her personal background and the facts of the crime. We acknowledge that defendant's statements may be a manifestation of her untreated psychological condition, but her failure to address the mental health issues (notwithstanding her active and eager participation in many self-help and educational activities) supports a conclusion that she presents serious and current risk of danger to society if released. It was incorrect to state that the Board failed to analyze the facts in light of the passage of time and the defendant's attitude.

### iii. *Unstable Social History.*

The superior court's decision did not expressly address this factor, which we find constituted "some evidence" to support the Board's decision. The Board referred to defendant's unstable relationships with six previous marriages and the abusive behavior in each. These factors were supported by Dr. Pointkowski's report, which cited defendant's history of involvement in unstable and tumultuous interpersonal relationships in diagnosing defendant's psychological state. Although defendant has participated in prison programs addressing battered women's issues and other self-help and educational activities, defendant's unstable relationships was viewed by Dr. Pointkowski as a symptom of her mental health issues relating to her diagnoses of borderline personality disorder with dependent and histrionic personality features. Although defendant has not been subjected to institutional disciplinary infractions, Dr. Pointkowski offered that her character pathology or personality disorder could not be presumed to be in remission while incarcerated, and suggested that her ability to control her impulses was related to her being in a structured milieu, such as prison.

Defendant's history of unstable interpersonal relationships and impulsivity was cited by Dr. Pointkowski as among the variables that elevate risk of violent potential. Outside the structure and stability of the prison milieu, this history presented a risk of violent recidivism. This constitutes "some evidence" to support the Board's decision.

### iv. *Summary.*

At the hearing on the petition, the superior court commented that one issue it had to address was how much weight to place on Dr. Pointkowski. During arguments, the court acknowledged that as it looked at that report, it provided all the evidence needed to say there is some evidence to support the Board's

decision. Later, the court stated that if it accepted the doctor's report, "this hearing is over." However, the court found incredible the diagnosis of borderline personality disorder because of its view that if someone had such a disorder, it would be manifested in prison by way of negative writeups.

The superior court's decision was the result of its act of reweighing the evidence, reconsidering the credibility of the expert opinions considered by the Board, and substituting its own judgment. This it should not have done. At a minimum, there was "some evidence" to support the Board's decision, compelling a denial of the petition for writ of habeas corpus.

## DISPOSITION

The judgment is reversed.

McKinster, J., and Codrington, J., concurred.