Filed 3/19/26  In re Menchaca CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re STEPHEN MENCHACA,<br><br>    on Habeas Corpus. | G064371<br><br>(Super. Ct. No. 93SF0230)<br><br>O P I N I O N |

Original proceedings; petition for writ of habeas corpus after a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge. Petition denied.

Stephen Menchaca, in pro. per.; and James R. Bostick, Jr., under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Sara J. Romano, Assistant Attorney General, Amanda J. Murray and Rachael A. Campbell, Deputy Attorneys General, for Respondent.

In 1994, a jury found Stephen Menchaca guilty of the attempted premeditated and deliberate murder of his spouse and further found Menchaca caused great bodily injury in the commission of that offense. In 2023, for the eighth time since his conviction, Menchaca appeared before a panel of the Board of Parole Hearings (the Board) for a parole suitability hearing. The Board found Menchaca continued to pose an unreasonable risk of danger to public safety and on that basis concluded Menchaca was not suitable for parole.

Menchaca filed a petition for writ of habeas corpus in this court, later supplemented, challenging the Board's determination. In such challenges we must apply the highly deferential "'some evidence'" standard (*In re Shaputis* (2011) 53 Cal.4th 192, 198–199 (*Shaputis*)) as to our review of the Board's decision. We conclude the Board did not err by finding Menchaca posed an unreasonable risk of danger to public safety. We therefore deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

I.

MENCHACA IS CONVICTED OF ATTEMPTED MURDER AND SENTENCED TO AN INDETERMINATE PRISON TERM OF LIFE WITH THE POSSIBILITY OF PAROLE

In 1994, a jury found Menchaca guilty of committing the premeditated and deliberate attempted murder of his wife, Stacey Haden. (Pen. Code, §§ 664, 187.) The jury found true the allegation Menchaca caused his wife to suffer great bodily injury in the commission of that offense. (*Id.*, § 12022.7, subd. (a).) Menchaca was sentenced to an indeterminate term of life imprisonment with the possibility of parole, plus a consecutive term of three years.

A panel of this court affirmed the judgment of conviction, rejecting Menchaca's contentions of evidentiary and instructional error at trial. (*People v. Menchaca* (Feb. 14, 1996, G016248) [nonpub. opn.].) In its opinion, the panel summarized evidence presented at trial as follows:

"Despite their $100,000 annual income, Stephen and Stacey were over $50,000 in debt in the fall of 1992. At that time, Stacey took over the finances and implemented a strict family budget. Money was tight and their relationship strained, but the Menchacas slowly began reducing their debt.

"However, when tax time rolled around the following year, Stephen became uncooperative. On the evening of April 6, 1993, an argument erupted over Stephen's failure to document certain withdrawals. When Stacey went to bed that evening, Stephen stayed on the couch.

"At 5:15 the next morning, Stephen abruptly awoke Stacey and said he needed help in the garage fixing a washing machine leak. He said the leak had shorted out the garage light and he needed her to hold a flashlight for him. Upon entering the garage, Stephen positioned Stacey by the washer, but she did not notice any water around the hoses. Moments later, she felt a 'tremendous blow' to the back of her head and ended up on her back with Stephen on top of her.

"Stephen gagged Stacey with towels and thrice slammed her head against the cement floor. She struggled and begged him to stop, but he instead tried smothering her with a blanket. When that failed, Stacey asked Stephen to think about the children. He replied, 'But, Stacey, we're in so much debt' and continued slamming her head into the floor.

"At one point, Stephen told Stacey to be quiet because he heard someone outside. He also examined her head, eyes and pulse during the ordeal. When Stacey suggested he flee to Mexico, Stephen opened a van in

3

the garage and looked inside. He then resumed banging Stacey's head into the floor before finally leaving at 7 a.m.

"Stacey made it to a neighbor's house and was taken to a hospital. She had a depressed skull fracture and lacerations on the side and back of her head. The skull indentation was semi-circular and consistent with having been caused by a hammer. At the time of the incident, Stephen was the beneficiary of life insurance policies on Stacey totaling $360,000.

"Stephen testified he was depressed and suicidal during 1992, because he felt he had let his family down. He often had trouble sleeping, and on the morning in question, he awoke at 2:30 with 'uncontrollable energy.' He did some laundry and noticed the washer was leaking. The garage light was out, so he got a flashlight and awakened Stacey.

"Stacey was upset over the situation and became angrier upon stubbing her toe near the washer. She cursed and began walking towards Stephen. Unsure what she was going to do, Stephen punched her in the head, causing her to fall. As Stephen reached for the flashlight, she dug her nails into his penis. He then grabbed her hair and smashed her head into the floor. He also may have put a towel over her face to quiet her. He contemplated going to Mexico but instead went in the house and took a shower.

"Later that morning, Stephen told police he had been upset over the finances and struck Stacey with a hammer, not his fist. He never mentioned anything about her grabbing his crotch. Psychiatrist Paul Blair testified Stephen suffered from dysthymia, a depression-related ailment. He said the disorder may have culminated in a psychotic break inside the garage, causing Stephen to lose touch with reality and experience confused and disorganized thinking."

4

The California Supreme Court denied Menchaca's petition for review.

II.

THE BOARD REPEATEDLY FINDS MENCHACA UNSUITABLE FOR PAROLE

Menchaca thereafter had seven parole hearings but was not released on parole. Following the seventh parole suitability hearing in November 2019, the Board denied Menchaca parole after finding he posed an unreasonable risk to public safety. The Board acknowledged there "were many facts that mitigated [his] risk," including the then most recent comprehensive risk assessment which rated Menchaca as a low risk for violence. The Board, however, "disagreed with that rating" because, inter alia, the psychologist therein made a statement that Menchaca "had difficulty reaching out to others during times of struggle" and his "ability to effectively cope with stressful situations in the community . . . remain[ed] uncertain." The Board noted "the life crime was all about . . . how [he] dealt with this economic stress" and therefore, "this is a material aspect in which [the psychologist] did not rate [Menchaca] low."

The Board acknowledged Menchaca's lack of criminal history and behavior in prison constituted mitigating factors, as were his involvement in various self-help programs in prison, acceptable proposed release plan, and "elderly parole status" (he was then 69 years old). The Board also acknowledged the length of his incarceration up to that point (26 years) and his "somewhat" diminished physical condition.

The Board, however, acknowledged the horrific and prolonged, albeit static, circumstances of the life crime and the significant trauma it caused for the trivial objective of financial gain. The Board explained Menchaca continued to lack remorse for what he did. The Board observed

5

Menchaca was "very matter-of-fact when talking about . . . the crime, talking about the effect of the crime on victims," and "very flat" with no emotion even when Haden and her "next of kin" gave their statements at the hearing.

The Board also noted that Menchaca does not appear to have changed with respect to the issue that brought him to prison—living beyond his means to manage others' favorable impression of him. Specifically, the Board was "really deeply concerned" Menchaca donated his then current wife's money instead of using it for its intended purpose of serving as canteen money. This suggested to the Board Menchaca had an ongoing problem with impression management in that he "want[s] to be seen as an individual that helps, supports other causes, . . . but in the end of it, . . . [he is] still playing with money" and "spending beyond [his means]." The Board further noted Menchaca's statements reflected he did not trust himself with money.

Finally, the Board observed Menchaca still had trouble understanding that his narcissistic personality disorder contributed to the commission of the life crime. Menchaca commented he had not really thought about it much, which concerned the Board.

The Board determined Menchaca's next parole suitability hearing should be set in five years' time.

III.

THE BOARD AGAIN DENIES PAROLE FOLLOWING THE
2023 PAROLE SUITABILITY HEARING

On June 7, 2023, the Board conducted its eighth, and most recent, parole suitability hearing for Menchaca. The Board questioned Menchaca, inter alia, on his most recent risk assessment in which the psychologist raised Menchaca's risk level of dangerousness to a moderate (lower moderate) risk level. The psychologist had observed Menchaca

6

"demonstrated partial self-awareness into [his] vulnerabilities for future violence but did not have a clear plan for ongoing domestic violence prevention or overspending management." The psychologist stated, "there remained room for growth regarding [Menchaca's] understanding of the factors that have contributed to his violent behavior and the importance of continuing to address such issues in order to maintain healthy relationship upon parole."

The psychologist further stated Menchaca's "lack of transparency regarding his problematic spending in the community warrant[ed] concern as it contributed to his life crime." The psychologist also stated: "Given [his] history of engaging in violence in an intimate relationship, relational stressors such as feelings of insecurity or financial strain, could potentially be destabilizing for him." In addition, the psychologist stated Menchaca had "some personality traits that result in him putting his wants before others and make him vulnerable to the exploitation of others." Those traits include "deceitfulness, recklessness, and lack of empathy." Further, the psychologist stated Menchaca's "triggers for violence include financial gain/profit."

At the hearing, when the Board's presiding commissioner asked Menchaca whether he had any other comments or concerns about the psychologist's assessment, Menchaca responded, "No, sir." Menchaca did not otherwise comment on the concerns the psychologist expressed in assessing Menchaca's level of risk.

At the conclusion of the hearing, the Board stated it had reviewed and considered precommitment and postcommitment factors in the case as well as the proposed parole plan; considered all the evidence, including Menchaca's central file, all documents contained in the 10-day and master file, the psychologist's comprehensive risk assessment, and additional

7

documents submitted during the hearing; and considered Menchaca's testimony as well as the input provided at the hearing by Menchaca's attorney, the Orange County District Attorney's representative, Haden, and Haden's representative.

The Board explained that after considering pertinent mitigating and aggravating factors, it found Menchaca posed an unreasonable risk to public safety and was therefore unsuitable for parole. The Board stated the next parole suitability hearing would be held in five years, which amount of time the Board felt was necessary for Menchaca to address the factors that continue to aggravate his risk.

IV.

MENCHACA PETITIONS FOR WRIT OF HABEAS CORPUS

Menchaca initially filed a petition for writ of habeas corpus in the trial court in which he challenged the Board's latest parole suitability decision. The trial court denied the petition.

In July 2024, Menchaca filed, in propria persona, the instant petition for writ of habeas corpus (the petition). In the petition, Menchaca argued his continued incarceration constituted cruel and/or unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution.

In August 2024, we issued an order directing Appellate Defenders, Inc. to recommend the appointment of counsel to represent Menchaca in this proceeding. In our order, we stated we reject the petition's contention Menchaca's continued incarceration constitutes cruel and/or unusual punishment under the state and federal constitutions. We invited counsel upon appointment, however, to supplement the petition with

8

additional grounds counsel deemed viable after reviewing relevant materials.[1]

In October 2024, we appointed counsel for Menchaca and, in December 2024, we granted his counsel's motion to augment the record with exhibits Menchaca had filed in connection with the petition for writ of habeas corpus he filed in the superior court.

In January 2025, Menchaca filed a supplemental petition for writ of habeas corpus (the supplemental petition). The following month, the Attorney General filed an informal response and Menchaca filed a reply.

In April 2025, we issued an order to show cause why a writ of habeas corpus should not issue and invited the Attorney General to file a return; the Attorney General did so and Menchaca thereafter filed a traverse.

DISCUSSION

I.

GOVERNING LEGAL STANDARDS

"Parole suitability decisions are governed by Penal Code section 3041 and title 15, section 2402 of the California Code of Regulations.[2] The regulations provide that, 'Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of

---

[1] In the supplemental petition for writ of habeas corpus later filed by appointed counsel, counsel reiterates Menchaca's argument that his continued incarceration following the Board's denial of parole constitutes cruel and/or unusual punishment under the federal and state constitutions. As discussed *ante*, we already summarily rejected that basis of the petition in our August 19, 2024 order but invited counsel to assert any additional grounds in a supplemental petition. We therefore do not consider that argument further in this opinion.

[2] "Subsequent references to 'Regs.' are to the California Code of Regulations."

9

the [parole authority] the prisoner will pose an unreasonable risk of danger to society if released from prison.' (Regs., tit. 15, § 2402, subd. (a).) Section 3041 states the parole authority 'shall grant parole to an inmate unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual.' (§ 3041, subd. (b)(1).) As a result, inmates in California have a due process liberty interest and 'an expectation that they will be granted parole unless the [parole authority] finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 (*Rosenkrantz*); see [*In re*] *Lawrence* [(2008)] 44 Cal.4th [1181], 1191.)

"The regulations specify the circumstances relevant to an inmate's suitability and unsuitability for parole that are to be considered by the parole authority. (Regs., tit. 15, § 2402, subds. (c)–(d).) The 'circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison.' (*Rosenkrantz, supra*, 29 Cal.4th at pp. 653–654, fn. omitted, citing Regs., tit. 15, § 2402, subd. (c).)

"The 'circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life,

10

especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release.' (*Rosenkrantz, supra*, 29 Cal.4th at p. 654, citing Regs., tit. 15, § 2402, subd. (d).)

"The Penal Code imposes additional considerations when the parole authority is determining parole for . . . elderly inmates (those who are 50 years or older) who have served a minimum of 20 years on their current sentence. ([Pen. Code,] §§ 3055, 4801.) . . . With 'elderly' inmates, the parole authority 'shall give special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence.' ([Pen. Code,] § 3055, subd. (c).)

"Relevant here, an inmate's insight into his or [her] commitment offense and other antisocial behavior is also a proper consideration in determining parole suitability. (*Shaputis* []*, supra*, 53 Cal.4th at p. 219.) As the California Supreme Court explained in *Shaputis* [], 'the regulations do not use the term "insight," but they direct the [parole authority] to consider the inmate's "past and present attitude toward the crime" [citation] and "the presence of remorse," expressly including indications that the inmate "understands the nature and magnitude of the offense,"' making '[t]hese factors fit comfortably within the descriptive category of "insight."' (*Id.* at p. 218.)

"Lastly, the regulations provide that the relevant circumstances 'are set forth as general guidelines; the importance attached to any

11

circumstance or combination of circumstances in a particular case is left to the judgment of the [parole authority].' (Regs., tit. 15, § 2402, subds. (c), (d).) 'Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.' (*Id.*, subd. (b).)" (*In re Rogowski* (2025) 112 Cal.App.5th 8, 52–54.)

## II.

### STANDARD OF REVIEW

"Whether to grant parole to an inmate serving an indeterminate sentence is a decision vested in the executive branch, under our state Constitution and statutes." (*Shaputis, supra*, 53 Cal.4th at pp. 198–199.) Our review, however, is "highly deferential." (*In re Lawrence, supra*, 44 Cal.4th at p. 1204.)

In *Shaputis, supra*, 53 Cal.4th at pages 220–221, the Supreme Court summarized the key considerations for courts reviewing parole-suitability determinations by the Board in relevant part as follows: "1. The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety. [¶] 2. That question is posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior. [¶] . . . [¶] 4. Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence[3] supports the

---

[3] The California Supreme Court has further explained: "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of

12

parole suitability decision. [¶] 5. The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence."

"The 'some evidence' standard . . . is meant to serve the [inmate's] interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion." (*Shaputis, supra*, 53 Cal.4th at p. 199.) Judicial review of parole suitability decisions "is limited, and narrower in scope" (*id.* at p. 215); it is "*more deferential* than substantial evidence review, and may be satisfied by a lesser evidentiary showing" (*id.* at p. 210). "Any relevant evidence that supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard." (*Id.* at p. 214.)

---

the Governor [or the Board]. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor [or the Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's [or the Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's [or the Board's] decision." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

## III.

In the supplemental petition, Menchaca does not contend the Board failed to consider all the evidence in the record or failed to evaluate all circumstances pertinent to the determination of Menchaca's suitability for parole. Instead, Menchaca argues the record before this court shows the Board denied him parole "for reasons having little to do with his current dangerousness to the community" and failed to otherwise "identify 'some evidence' supporting a conclusion that Menchaca is unsuitable because he is currently dangerous." He argues, "[t]he 2023 panel like the one in 2014 relied for its conclusion primarily on the egregiousness of [Menchaca's] commitment offense. But after 28 years of imprisonment and extensive programming [Menchaca] was no longer the same individual he was going in."

Like the Board, we acknowledge the record shows the existence of mitigating factors which include Menchaca's age, participation in programs, adequate plans for release, acceptance to transitional housing, support from family and members of the community, and submission of relapse prevention plans addressing his risk factors. The record also shows he has not received a single serious rules violation report during his incarceration and had no prior arrest history. Nevertheless, applying the governing standard of review, we must conclude a modicum of evidence supports the Board's decision.

At the conclusion of the 2023 parole hearing, the Board provided a lengthy explanation for denying parole at that time. In its statement, the Board stated it found Menchaca's actions in committing the life offense to have been heinous, brutal, and deplorable and to have demonstrated a callous disregard for Haden's life and suffering. The Board, however,

14

acknowledged those findings constituted static factors which, pursuant to California Supreme Court authority, "may no longer indicate a risk of current danger to society in light of a lengthy period of rehabilitative programming." This acknowledgement by the Board shows it was not laboring under any misapprehension of the governing legal standards. Instead, the Board stated that in determining Menchaca's level of dangerousness, it considered whether "something current [has made] these static factors remain relevant."

The Board stated it found that during the most recent hearing Menchaca continued to express views demonstrating he had not yet sufficiently changed and had not made much progress, "if any," since the 2019 hearing with respect to his gaining understanding as to what triggers him and what helps him healthfully cope so as to avoid re-offending in the future. The Board's findings are directly supported by the most recent comprehensive risk assessment prepared by a psychologist who concluded Menchaca demonstrated only partial self-awareness of his vulnerabilities for future violence and lacked a "clear plan for ongoing domestic violence prevention or overspending management." The psychologist ultimately assessed Menchaca as posing a moderate risk of dangerousness. Menchaca's two prior comprehensive risk assessments reflected he posed a low risk of dangerousness. The Board expressed its concern Menchaca seemed to be "going backwards."

The Board also stated it found Menchaca still grappled with "impression management" issues, evidenced by Menchaca making statements at the most recent hearing to make him look better to the Board, even though such statements conflicted with his prior statements and other evidence in the record. For example, and as acknowledged in the supplemental petition, Menchaca told the Board at the 2023 hearing that after he stopped the

15

assault of Haden, he planned to take a shower to clean himself and then take Haden to the hospital. He previously stated, however, that while he was assaulting her, he thought about taking her to the hospital, but then thought about how doing so would make him look to others. The Board asked Menchaca about the inconsistency, but Menchaca had no answer.

Further, at the most recent hearing, Menchaca denied prior planning of the attempted murder of Haden, or, in so doing, disabling the light bulb in the garage. He also offered a long explanation regarding the existence of leaked water from the washing machine in the garage. All such statements conflict with the long established record.

In addition, at the 2019 parole hearing, Menchaca had stated he received money from his then current wife for canteen use but that he donated that money to cancer research. At the 2023 parole hearing, Menchaca arguably sanitized his story by explaining that the money he received from his current wife was not hers but his own, as he had received an inheritance she collected and forwarded to him. Menchaca had not previously disclosed he had received any such inheritance. When asked by the Board why he had failed to mention his inheritance to the prior panel or to the psychologist during the comprehensive risk assessment process, Menchaca had no answer.

In *In re Rogowski, supra*, 112 Cal.App.5th at page 67, the appellate court, in affirming the Governor's decision to deny the inmate parole, observed in part: "[T]he record reveals [the inmate] has a history of lying about a range of topics, including when he believes it will serve his interests. And there is reason to think this tendency was on display during the 2022 parole hearing." In that case, the inmate thereafter denied changing his story and ultimately became combative when confronted with evidence of

16

his inconsistency. (*Ibid.*) The appellate court concluded: "On this record, the Governor could reasonably question [the inmate]'s credibility during the 2022 parole hearing . . . about other matters on which he was testifying in favor of his release." (*Ibid.*) Furthermore, the appellate court concluded the inmate's inconsistencies "bear on our conclusion that the record supports the Governor's parole unsuitability decision, including the Governor's determination [the inmate] possessed a materially deficient level of insight." (*Id.* at p. 18; see *In re Mims* (2012) 203 Cal.App.4th 478, 488 [holding the inmate's inconsistent reports of rapes and physical abuse were properly interpreted as "an evolving effort to mitigate [the inmate's] own culpability" and as such, constituted some evidence of the inmate's lack of insight into the cause of the crime].)

Similarly, in the instant case, Menchaca's inconsistent statements support the Board's findings he lacked credibility and possessed a materially deficient level of insight.

In sum, after reviewing the record before us, we conclude the Board's decision reflects due consideration of the appropriate factors as applied to Menchaca in accordance with applicable legal standards. As a modicum of evidence in the record supports the Board's ultimate finding Menchaca poses a current threat to public safety and concomitant decision to deny parole, we must deny Menchaca's petition seeking to overturn that decision.

17

## DISPOSITION

The petition for habeas corpus is denied.


                                        MOTOIKE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.